## Capozi *v.* Hearst Publishing Company, Inc., Appellant.

Argued October 3, 1952.  Before STERN, STEARNE, JONES, CHIDSEY and MUSMANNO, JJ.

*Arthur M. Grossman* and *Leonard Mendelson*, for appellants.

*Charles J. Margiotti*, with him *Harry Savage* and *Margiotti & Casey*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, November 10, 1952:

Plaintiff, Vincent A. Capozi, brought an action in trespass against Hearst Publishing Company, Inc., and Jacob Wilder to recover damages for personal injuries resulting from the latter's negligent driving of a truck. The Hearst Publishing Company filed an answer denying any agency relationship between itself and the individual defendant.  A jury rendered a verdict of $60,000 against both defendants.  The defendants together filed motion for new trial and defendant, Hearst Publishing Company, separately filed motion for judgment in its favor *non obstante veredicto.*

Prior to argument on these motions, defendants petitioned for and the court issued a rule upon plaintiff to show cause why he should not carry out the terms of an alleged agreement of settlement made by coun-

sel for the parties prior to the verdict, or suffer a decree against him for $22,500 (the claimed amount of settlement) and record costs in satisfaction of his cause of action. The plaintiff filed an answer to this petition and rule, and depositions were taken. The lower court in its opinion dismissing the motions for new trial and judgment *non obstante veredicto,* with reference to the rule issued said that ". . . the case was apparently settled as far as counsel was concerned, but there is no evidence that the plaintiff agreed to anything his counsel said, and the plaintiff had a contract with his attorney whereby the case could not be settled without the permission of the plaintiff. Therefore, we believe this case was properly submitted to the jury, . . .". As it appeared that the court intended to and in effect did discharge the rule, the parties stipulated that the appeal to this Court should be argued and decided as if an order had been entered expressly discharging the rule. The dismissal of the defendants' motion for new trial was conditioned upon remittitur being filed for all of the verdict in excess of $40,000. This remittitur was filed and judgment was entered against both defendants in the amount of $40,000. On this appeal therefrom defendants make various contentions.

We shall first consider the claim by both defendants that the alleged settlement agreement was binding upon the plaintiff. Under the rule issued, depositions were taken of the plaintiff, counsel for plaintiff, counsel for the defendants and the representative of defendants' insurance carrier, and the contract between plaintiff and his attorneys was introduced which contained a provision "Said attorneys shall have full power to settle or compromise said suit or suits as may appear to them to my best interest; but, in no event, for a sum less than that expressly approved by

me; . . .". Negotiations for settlement of the case had been carried on for several weeks, prior to and during the course of the trial. They appeared to have culminated in what occurred in the trial judge's chambers when counsel for both parties met there with the trial judge. As indicated in the finding contained in the lower court's opinion, above quoted, there appeared to have been an agreement between counsel for settlement of the case at $22,500, and the real question at issue was whether plaintiff's counsel were authorized to agree to a settlement in such amount. Appellants make no claim of ratification by plaintiff of his attorneys' act as in *Yarnall v. Yorkshire Worsted Mills*, 370 Pa. 93, 87 A. 2d 192.

In their brief appellants state, "We do not question the well established principle that an attorney's mere status as attorney in the case does not vest him with authority to settle his client's case without his client's consent. We submit, however, that there is sufficient evidence in the record to justify the conclusion that the plaintiff himself had authorized his attorney to settle the case for $22,500.00."

In their depositions, the plaintiff and his attorneys denied that authority was given. Appellants review the testimony and forcibly argue that the actions of plaintiff and his attorneys throughout the extended negotiations contradict their assertions in this regard. However, there was competent evidence to support the finding of the court below that there was no settlement of the case binding upon or enforceable against the plaintiff, and we cannot say that the court below abused its discretion in arriving at such conclusion.

Defendant Hearst Publishing Company contends that judgment *non obstante veredicto* in its favor should have been granted because of the failure of plaintiff

to prove the existence of a master-servant relationship between it and the individual defendant. In support of this contention the publishing company first claims that there was no evidence introduced to connect it with any of the events or personalities involved in the accident. The truck which ran into plaintiff was driven by the defendant Wilder and was being used for distribution of a newspaper daily, the "Pittsburgh Sun-Telegraph". Although the named defendant was Hearst Publishing Company, Inc., the case was tried on the theory or assumption that the "Sun-Telegraph", or "Sun-Tele" as it is popularly known, was the codefendant with Wilder. Throughout the testimony bearing upon Wilder's status either as an independent contractor or employe of his codefendant, the latter was invariably referred to as "Sun-Telegraph". The court in its charge referred to the "Sun-Telegraph" as the defendant, at one time stating to the jury: "Now, then, the defendant says—they have two different defenses. The Sun-Telegraph, which is owned by the Hearst papers, says this man was not their employee and, therefore, 'We are not responsible for his negligence. He was an independent contractor.' ", and instructed the jury: "You can bring them [verdicts] in against Mr. Wilder and the Sun-Tele or you can bring it in against either of them, and I think it would be foolish to bring it in against the Sun-Tele if you do not bring it in against Wilder." The trial judge at the conclusion of his charge said: "Is there anything else that either side would like me to charge on?". Various requests were then made in which the corporate defendant was referred to by counsel on both sides as "Sun-Tele" or "the newspaper". At no time did counsel for the defendant Hearst Publishing Company seek any correction by the court in its charge in this respect, and although he moved for a compulsory non-

suit as to the corporate defendant and filed a point for binding instructions in its favor, in neither case was it placed upon the ground that no testimony had been adduced involving the Hearst Publishing Company.

Defendants' counsel proceeded throughout the trial as if "Sun-Telegraph" or "Sun-Tele" and the named defendant, Hearst Publishing Company, were synonymous or identical, acquiesced in the lower court's similar treatment of the corporate defendant, and it would be unfair and unjust under the circumstances to now permit reliance upon this misnomer to which defendant throughout the trial subscribed.[1]  Cf. *Skocich et al. v. F. J. Boutell Driveaway Company*, 317 Pa. 26, 176 A. 19.

We turn to the more substantial argument in support of the contention now being considered: Should the jury have been permitted to find the existence of a master-servant relationship between the two defendants?  In order to connect and impose liability upon the corporate defendant, plaintiff relied in the presentation of his case upon the presumption of ownership and agency arising out of the display of a defendant's name upon a business truck: *Hartig v. American Ice Co.*, 290 Pa. 21, 137 A. 867.  The plaintiff's case established that the truck which ran into plaintiff and driven by Wilder, had the words "Sun-Telegraph" in large letters on both of its sides.  The words were not permanently painted thereon but appeared on posters that were pasted on the sides of the truck, and there

---

[1] It is not contended or suggested that the "Pittsburgh Sun-Telegraph" is a separate corporate entity. During the trial appellant offered in evidence a written contract between Wilder and "Pittsburgh Sun-Telegraph, *Department of Hearst Publishing Company, Inc.*". (Emphasis supplied) The rejection of this offer is discussed infra.

was testimony that in addition to the words "Sun-Telegraph" the posters served to advertise articles that would appear in current or future editions of the paper. Appellants argue that the presumption as to ownership and agency applies where the name of the defendant is permanently painted on the truck, but that there is no reasonable basis for inferring that a vehicle is owned or used in the business of one whose product is advertised on the vehicle; that it is common knowledge that certain companies utilize their vehicles to advertise the products of other companies. We can see no substantial difference in the applicability of the presumption in question, between a name painted on a truck or printed on a poster attached to the truck if it so predominates in the sight of the passing public to reasonably permit the inference of agency and ownership. A poster may well be used to not only denote proprietorship but to permit change in the advertisement of the proprietor's own product.

The defendant Wilder testified that the posters, which were 6 feet by 3 feet in size, were put on every week by an employe of the "Sun-Telegraph". The testimony clearly indicated that the words "Sun-Telegraph" predominated in the printed matter so as to catch the eye. One witness testified that he saw the trucks every day and that they had the words "Sun-Telegraph" on them. He further testified that the posters covered the whole side of the truck. Another witness said the truck had big letters "Sun-Tele" on the side. A reading of their testimony shows that although the trucks had other words advertising specific articles and features in the "Sun-Telegraph", the focus of attention to all were the words "Sun-Telegraph".

Unquestionably the outstanding and distinctive words were "Sun-Telegraph" which characterized the corporate defendant's business or trade name: (See

*Vance et al. v. The Freedom Oil Works Company,* 113 Pa. Superior Ct. 280, 173 A. 496). We are of the opinion that the evidence here sufficiently justified the presumption that the truck belonged to the defendant and was being used in its business.

In *Sefton v. Valley Dairy Company,* 345 Pa. 324, 28 A. 2d 313, we said at p. 326: "It is well settled by our previous decisions that the presence of a defendant's name on a commercial vehicle raises a rebuttable presumption that the vehicle is owned by defendant and that the driver of the vehicle is a servant of defendant acting within the scope of his employment: Williams v. Ludwig Floral Co., 252 Pa. 140, 97 A. 206; Holzheimer v. Lit Bros., 262 Pa. 150, 105 A. 73; Sieber v. Russ Bros. Ice Cream Co., 276 Pa. 340, 120 A. 272; Hartig v. American Ice Co., 290 Pa. 21, 137 A. 867; Talarico v. Baker Office Furn. Co., 298 Pa. 211, 149 A. 883. This presumption is sufficient to take the case to the jury even though defendant produces uncontradicted evidence that the driver was not its employee (Holzheimer v. Lit Bros., supra), or produces evidence that it did not own the vehicle in question (Hartig v. American Ice Co., supra). The rule is thus stated in the *Hartig* case: 'Where the evidence produced by plaintiff, if believed, is sufficient to prove that he was injured by the negligence of one in charge of a business automobile, bearing the trade name of defendant, displayed thereon in such a manner as trade or business names are usually placed on vehicles used for trade or business purposes, these facts are sufficient (1) to raise the presumption that the car in question was owned by defendant and was being used by the person in charge thereof for defendant's business purposes; and (2), when such presumptions so arise, they entitle plaintiff to have his case submitted to the jury.' ".

The defendant Wilder testified that he was the owner of the truck, but this did not overcome the presumption: *Hartig v. American Ice Company*, supra. It may be added that the defendant Wilder not only testified that the truck carried the words "Sun-Telegraph" on its sides but the import of his testimony is that the truck was used for the distribution of the newspaper and apparently for no other purpose. This was additional evidence in support of the presumption that it was being used in the corporate defendant's business. There was other testimony bearing on the relationship between Wilder and the corporate defendant, some indicating that the former was an employe and other that he was an independent contractor, but under all the evidence in the record presented, the question of the relationship was for the jury. And the plaintiff in opposing judgment *non obstante veredicto* was of course entitled to have all of the evidence and reasonable inferences therefrom considered most favorably to him.

We pass to the appellants' third contention that a written contract[2] covering the relationship between the

---

[2] "(½ Ton Truck)

**AGREEMENT**

This Agreement is made and entered into this 5th day of January, 1943 by and between Pittsburgh Sun-Telegraph, Department of Hearst Publishing Co., Inc., party of the first part (hereinafter called the 'Company'), and Jacob Wilder residing at 149 Jucunda Street, Pittsburgh 10, Pennsylvania, party of the second part (hereinafter called the 'Owner').

**WITNESSETH:**

Whereas, the Owner is engaged in the trucking and hauling business and is the owner of automotive equipment suitable for those purposes which he desires to operate in Pittsburgh, Pennsylvania, and vicinity, for the transportation of Pittsburgh Sun-Telegraphs (a daily and Sunday newspaper published by the Company) for the period beginning January 5, 1948 and ending March 29, 1950, and

individual and the corporate defendant was improperly excluded from evidence. The defendant Wilder testified that he was the owner of the truck which he was operating at the time of the accident and that there

---

Whereas, the Company is willing to enter into an agreement with the Owner, whereby the Owner, as independent contractor, will transport Pittsburgh Sun-Telegraphs in Pittsburgh, Pennsylvania, and vicinity during said period.

Now, therefore, in consideration of the premises and of the agreements hereinafter set forth, the parties hereto respectively agree as follows:

1. The Owner hereby agrees to furnish ½ ton truck or the equivalent thereof and a driver to operate it in Pittsburgh, Pennsylvania, and vicinity, and transport or cause to be transported to parties and places designated by the Company, daily and Sunday editions of the Pittsburgh Sun-Telegraph, on every day (except New Year's Day, Memorial Day, Independence Day, Thanksgiving Day and Christmas, or days celebrated as such) during the period beginning January 5, 1948, and ending March 29, 1950, and the Company agrees to pay the Owner during said period for such transportation and for all agreements of the Owner hereunder in accordance with the provisions hereinafter set forth.

2. The Owner agrees to supply such transportation during said period, and the Owner further agrees to pay for all drivers and for all gasoline, oil, tires, garaging, parts, or other supplies, and to make and pay for all repairs which may be needed in order to operate such a truck and provide said transportation.

3. The Owner agrees to procure and maintain, during the term of this agreement, $10,000-$20,000 Public Liability Insurance and $5,000 Property Damage Insurance, which insurance shall be in a recognized stock company and, in addition to protecting the Owner, shall protect, indemnify and save harmless the Company from any and all liability by reason of any accidents or injuries of any kind which may result from the operation or use of said truck. The Company shall be named in the insurance policy as one of the parties insured and said policy or a certificate thereof shall be delivered to the Company upon a receipt being given to the Owner for the same. The Owner agrees to pay all State and Federal taxes, to maintain all registration, driver's and public utility licenses which may be required by the constituted authorities, and the Company shall not be responsible therefor.

was a contract covering the use of the truck which he identified. He was asked "Under the terms of this contract, Mr. Wilder, what was your status with the Sun-

---

4. The Owner agrees, for the sums hereinafter set forth, to provide transportation seven (7) days a week (except on the holidays designated in Section. 1) eight (8) hours each day (exclusive of time required by the driver for lunch) or a longer number of hours if necessary because of conditions or emergencies. The time of the making of the last delivery on the last trip each day shall be regarded as the end of the transportation day. If the Owner provides transportation for sixteen (16) hours exclusive of time required by the driver for lunch), it is agreed that the transportation during the second eight hours shall be paid for at the same rates as for transportation during the first eight hours.

5. Subject to the approval of the proper governmental authorities the Company hereby agrees to pay the Owner for the transportation herein provided for and the operation of a truck as herein specified, at the rate of Two dollars and Five and 5/10 cents ($2.055) per hour or the sum of One Hundred Fifteen dollars and Ten cents ($115.10) per week of seven days. The sum shall be paid each Tuesday for the transportation furnished during the previous week ending with and including Sunday, with the exception of transportation furnished during those weeks in which there are holidays, for which weeks a prorated portion, on the basis of a seven-day week, shall be deducted for the number of holidays contained in the week. In the event the time required for the transportation of daily or Sunday Pittsburgh Sun-Telegraphs shall be more than eight hours (exclusive of time required by the driver for lunch) in any day, except in the case of the second consecutive transportation day, the Company shall pay the Owner, provided such extra time for transportation is due to the Company's needs or requirements, and is not caused by the breakdown of the truck or the Owner's negligence, at the rate of Two dollars and Five and 5/10 cents ($2.055) per hour for each extra hour needed for such transportation. Should the publication of the Pittsburg Sun-Telegraph at any time be suspended for any reason, the transportation provided for herein shall not be required and the Owner shall not be entitled to payments during the said period of suspended publication; provided that if the Owner provides a truck and a driver for transportation on the first day that the publication is suspended due to the Company not notifying him thereof

Tele?". Counsel for the plaintiff objected: ". . . because the contract speaks for itself. It is the best evidence, if that is the contract." Counsel for the defendants then offered the contract in evidence with the pro-

---

in advance he shall be paid for that one day on a pro rata basis in accordance with the rate set forth in Section 5.

6. In case the Owner fails to furnish transportation as herein agreed the Company shall have the right to cancel this agreement.

7. It is mutually agreed that if due to governmental rulings, regulation or restrictions, or on account of the war, the Company does not require the transportation provided for herein or if the Owner is unable to furnish such transportation, or the equivalent thereof, either party may cancel this agreement by giving two weeks' written notice of its desire to do so to the other party.

8. The Owner agrees that if during the term of this contract he should decide to replace the truck presently used by him in furnishing the transportation hereunder he will first notify the Company of his intention to make the replacement and the Company will advise the Owner whether it desires the replacement to be in the form of a one-half ton truck, or a one-ton truck. If the Company specifies a one-half ton truck and the Owner furnishes a one ton truck the Company agrees to pay for the transportation furnished at the rate of hire as set forth in Section 5 hereof. If, however, the Company specifies that the Owner shall replace his present truck with a one ton truck and the Owner does acquire and furnish a one ton truck the Company agrees to pay the Owner for a transportation week of seven (7) days One Hundred Twenty-Two dollars and Sixty cents ($122.60) instead of One Hundred Fifteen dollars and Ten cents ($115.10) as set forth in Section 5, hereof, it being understood and agreed that all other provisions of this agreement, except the increase of Seven dollars and Fifty cents ($7.50) shall remain unchanged.

9. If either party does not wish to renew this agreement it will give the other party written notice to that effect at least sixty (60) days prior to March 29, 1950; if neither party gives such notice to the other this agreement shall be renewed for one year to March 29, 1951. It is mutually agreed that a letter mailed to the Owner to the address which appears on Page 1 of this agreement (or to any new address of which the Owner notifies the Company by mail in writing) shall be sufficient compliance with the requirements of this paragraph.

vision that ". . . that portion of the contract which refers to public liability insurance be kept from the jury's knowledge." Plaintiff's counsel objected to the offer unless the contract was offered as a whole. The court ruled that the contract must be offered in its entirety and rejected the offer. Counsel excepted to the ruling.

10. This Agreement shall terminate in accordance with the provision of Section 9, or prior thereto upon the death of the Owner; provided, however, that in such event the Owner's wife may continue the contract for a period of three months subsequent to the date of the Owner's death, if she elects to do so in writing within one week after the date of the Owner's death.

11. The Owner represents that he is a member in good standing of Newspaper Chauffeurs, Distributors and Helpers Local Union No. 211 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, American Federation of Labor; and the Owner further represents that the said International Union recognizes his right to make this agreement as an independent contractor; and the Owner also represents that his seniority standing in said union supersedes the seniority standing of all other members of the Sun-Telegraph chapel of said union, who on the date of the making of this agreement, are not regularly engaged in transporting the Pittsburgh Sun-Telegraph for the Company on a weekly basis; and the Owner agrees that if at any time he is expelled from said union with no further union appeal available, or if his seniority standing is not as herein represented, or if for any reason he loses his present seniority standing, this agreement shall be null and void and all obligations of the Company hereunder shall thereupon immediately cease and terminate.

12. It is agreed between the parties hereto that if the union rate for drivers referred to in Sections 1 and 2 hereof changes during the terms of this agreement, in that event the rates set forth in Section 5 shall be increased or decreased in the same amount as the change in the said union driver's rate, provided that any such change in rate shall be subject to the approval of the proper governmental authorities.

13. It is understood and agreed between the party of the first part and the party of the second part that this agreement supersedes and cancels all previous or existing agreements between the parties.

The provision referring to public liability insurance appears in paragraph 3 and is as follows: "The Owner agrees to procure and maintain, during the term of this agreement, $10,000-$20,000 Public Liability Insurance and $5,000 Property Damage Insurance, which insurance shall be in a recognized stock company and, in addition to protecting the Owner, shall protect, indemnify and save harmless the Company from any and all liability by reason of any accidents or injuries of any kind which may result from the operation or use of said truck. The Company shall be named in the insurance policy as one of the parties insured and said policy or a certificate thereof shall be delivered to the Company upon a receipt being given to the Owner for the same. . . .". The contract was unquestionably of evidential importance in establishing the legal relationship between the individual defendant and the corporate defendant. A cursory inspection of the instrument clearly indicates that under its terms Wilder acted as an independent contractor and not as an employe of the corporate defendant in the use of the truck. If offered in its entirety it was clearly relevant. The sole question, therefore, is whether it was properly receivable in evidence with the exclusion of the above portion relating to insurance.

---

WITNESS the due execution hereof the day and year first above written.

Pittsburg Sun-Telegraph,
Department of Hearst Publishing Co., Inc.
By (s) Leo. A. Wise,
    *Asst. Sec'y.*
(s) Jacob Wilder.

Witness:
(s) A. E. Beckman.
Witness:
(s). Theodore. R. Cozza."

Several applicable principles of law are apparent. First, the fact that a defendant in an action for personal injuries is insured against liability is usually irrelevant and prejudicial: *Kaplan et al. v. Loev,* 327 Pa. 465, 194 A. 653; secondly, that if such information becomes relevant it is under certain circumstances admissible despite its prejudicial effect: *Lenahan v. Pittston Coal Mining Company,* 221 Pa. 626, 70 A. 884; *Jury v. New York Central Railroad Company,* 167 Pa. Superior Ct. 244, 74 A. 2d 531; thirdly, as a general rule a party may not offer in evidence the portions of a document which are beneficial to his case and withhold the harmful portion but must instead offer the document in its entirety: *Cary v. Cary,* 189 Pa. 65, 42 A. 19; fourthly, there are exceptions to the rule that the whole document must be offered: *Beaver Trust Co., Guardian v. Kertis, Intervenor,* 298 Pa. 322, 148 A. 471; *Baldi v. Metropolitan Life Insurance Company,* 30 Pa. Superior Ct. 213.

In our consideration of this phase of the appeal, we have found no case with substantially similar facts, nor any authority ruling the precise question presented. However, we are convinced that an application of the principles above enunciated makes it clear that the court below committed reversible error. In the present case the document was offered in support of the contention that the individual defendant was an independent contractor. The provision as to insurance was completely consonant with the contention of the defendant Hearst and in no manner could aid plaintiff's contention that the driver was the employe of defendant Hearst. Thus the only possible purpose its receipt in evidence could serve, from plaintiff's viewpoint, would be to reveal to the jury the existence of insurance. The general rule that a document must be offered in its entirety does not, in our opinion, apply to

a document otherwise admissible which contains matter that is highly prejudicial, and therefore of itself inadmissible, unless the exclusion of the latter adversely affects the party insisting upon the introduction of the document in its entirety.

Counsel for plaintiff relies upon cases where it has been held discretionary with the court as to what documentary evidence should go out with the jury and endeavors to similarize the present situation because of the language employed by counsel for the appellants at the time of the offer. It is sufficient answer to say that the offer in substance was the introduction of the contract into evidence without the provision with respect to public liability insurance. The objection by counsel for plaintiff was in substance to the introduction of less than the entire contract and the court's ruling was with respect to the contract's introduction into evidence. No discretion was involved in this situation. The exclusion of the prejudicial portion of the contract was a matter of right. The refusal of the admission of the document into evidence with the exclusion was harmful error.

Since a new trial must be granted and the verdict therefore set aside, it is unnecessary to consider appellants' remaining contention that the verdict as reduced was still excessive.

Judgment is reversed and a *venire facias de novo,* is awarded.