CASEY *v.* ROMAN CATHOLIC ARCHBISHOP
OF BALTIMORE

ROMAN CATHOLIC ARCHBISHOP OF
BALTIMORE *v.* CASEY

(Two Appeals in One Record)

[No. 299, September Term, 1957.]

*Decided July 19, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Paul Berman* and *Melvin J. Sykes,* with whom were *Sig-
mund Levin* and *Theodore B. Berman* on the brief, for the
appellant and cross-appellee.

*J. Gilbert Prendergast* and *George E. Thomsen,* with
whom were *Clark, Smith & Prendergast* on the brief, for the
appellee and cross-appellant.

HORNEY, J., delivered the opinion of the Court.

Harriet M. Casey, plaintiff-appellant and cross-appellee
(the plaintiff), brought suit in the Superior Court of Balti-
more City against Roman Catholic Archbishop of Baltimore,
a corporation sole of the State of Maryland (corporation sole
*or* defendant), as the holder of the legal title to St. Patrick's
Roman Catholic Church of Havre de Grace, for damages aris-

ing out of personal injuries she sustained when she slipped and fell on the waxed floor of the church building. The jury returned a verdict in favor of the plaintiff for $2,500, but, claiming that the award was inadequate, she appealed alleging errors in the examination of the jurors on their *voir dire,* in a ruling on the evidence, and in the instructions of the court with respect to damages. The right of the plaintiff to appeal from a judgment in her favor is not disputed. The corporation sole filed a cross-appeal on the ground that there was insufficient evidence of negligence for the case to go to the jury.

In the afternoon of Saturday, October 2, 1954, before the plaintiff arrived, two workmen or sextons had cleaned and waxed the floors inside the church. At least three-fourths of the center aisle had been waxed with a liquid spread by an ordinary domestic rag mop made of twisted strings. No buffer was used because it was too late in the afternoon and the sextons thought it would be "better to leave the wax on and let the people work it out themselves," that is, by walking on it. Although there was no unanimity as to the condition of the weather, it appears that it was not conducive to quick drying. The church was not well lighted, and one witness testified that the center aisle was the darkest part of the church. The church had stained glass windows, and there was evidence that there was no artificial lighting in the main body of the church at the time of the accident.

The plaintiff, an elderly maiden lady and a member of St. Patrick's Parish, arrived at the church at about 5 o'clock, entered the main door, which was at the far end of the church from the alter, walked down the center aisle to the second pew from the main door, and prayed prior to making her confession. Her ante-confession prayers completed, she turned toward the main door, proceeded to the confessional booth immediately to the right of the center aisle from the main entrance, and remained there until about ten after five. Then, as was her custom, and in fact the usual custom for all parishioners, she walked up the center aisle toward the altar to complete her prayers. She did not notice that the floor was slippery until she slipped and fell at a point slightly over halfway to the altar rail. When her feet slipped from under her,

she fell backwards. She tried to break the fall with her hands and in so doing broke bones in both wrists, and the back of her head struck the tile floor. A sergeant in the Air Force interrupted his prayers to aid the plaintiff, and when he approached the place where she was lying, he too slipped but managed to check a fall. He then observed a translucent fluid in the middle of the aisle which appeared to be wax. There was other testimony that there were wet spots which were "dangerously slippery" due to the wax on the floor. Another parishioner had also slipped a few minutes before the plaintiff but she did not fall. Although the evidence was conflicting, there was also testimony that there were no barriers across the center aisle to give warning of the possibly dangerous condition. No verbal warning of the slippery condition was given to the plaintiff, although at least one other parishioner was so warned.

Father Monmonier, the parish priest, was called and, according to the sextons, he tested the floor by trying to "skate" up the aisle on the waxed surface to ascertain how slippery the floor was. He "skated" from where the plaintiff was lying and was stopped only by the altar rail. As a result of the test, he gave orders to the sextons to remove the wax immediately and to mop the center aisle with clear warm water, which was promptly done.

After the accident the plaintiff was taken to the hospital where she remained for three weeks. For three weeks after her discharge, a nurse and a maid took care of her. But the effects of her injuries persisted. It was estimated that she had a permanent disability of between thirty-five and fifty per centum, and a loss of functioning in both hands and both arms.

We shall consider the question of the sufficiency of the evidence as to negligence first, and then the errors alleged by the plaintiff.

### (i). Negligence.

Since there was legally sufficient evidence to entitle the plaintiff to recover, the trial court was correct in submitting the issues of negligence and contributory negligence to the jury. In *Isaac Benesch & Sons v. Ferkler*, 153 Md. 680, 139

A. 557 (1927), recovery was permitted against a department store by a customer who testified that the floor on which she fell was " 'dark and mucky and smeary, like an oiled floor would be where the oil was not dried,' " and that the oily condition of the floor was "what caused her to fall." We upheld the propriety of submitting the case to the jury by saying at p. 684:

> "These were facts from which the jury might conclude that the appellant [defendant] had been negligent. It was not the mere fact that the floor was oiled and the appellee [plaintiff] fell that entitled her to recover; it was the condition in which the floor was left as a result of the oiling that was submitted to the jury, * * *."

In the case now before us there was ample evidence of the condition in which the floor had been left. The wax had been poured on and spread only with a rag mop, and had not been buffed. No effort had been made to leave the surface of the floor with a uniform smoothness. That task was left to "the people" by walking on it. As a result wet spots remained in the middle of the aisle which were "dangerously slippery." One such spot was within two paces from where the plaintiff fell. Other persons had slipped on the floor both before and after the plaintiff had fallen. Immediately after the accident the parish priest was able to slide or "skate" up the aisle about thirteen feet to the altar rail, whereupon he ordered the wax removed. One of the sextons had warned another parishioner, but he had not warned the plaintiff of the slippery condition. Under these circumstances, it cannot be said that there was *no* evidence of negligence. See *Prosser, Torts* (2d ed. 1955), § 78. Furthermore, whether the plaintiff was guilty of contributory negligence in failing to be on the lookout for a waxed floor or in not observing the slippery condition of the floor was also a question of fact for the jury, and not a question of law for the trial court to decide in this case. *Isaac Benesch & Sons v. Ferkler, supra.*

(ii). *Voir Dire* Examination.

Before the trial began the plaintiff requested the court to

inform the jury that the defendant was a corporation sole and as such was the "owner and * * * in possession and control" of the church building, and to propound the following questions to the panel of jurors on their *voir dire:*

"(1) Does any member of the jury panel have any preconceived objections to, or any preconceived opinions in favor of, or any bias or prejudice in favor of or against, a suit in which Roman Catholic Archbishop of Baltimore, a corporation sole of the State of Maryland, is sought to be held liable in damages for injuries claimed to have resulted to a person, a member of the Parish of the Roman Catholic Church in which such person claims to have been injured, that would prevent you from fairly and im‑partially deciding such a case?"

"(2) If, in your opinion, the evidence in the case warrants a verdict for the plaintiff, Miss Casey, against Roman Catholic Archbishop of Baltimore, a corporation sole of the State of Maryland, the defendant, is there any member of the jury panel who could not fairly and impartially assess damages in the case in the same manner as if the defendant were a regular corporation or a natural person?"

The court declined to inform the jury or to ask the questions as requested. There is a difference of opinion as to whether the jurors heard the clerk recite the title of the case when it was called for trial. In any event, the trial court, after informing the jurors that one of the parties was a "religious corporation," propounded the following question:

"Is there any reason, such as religious scruples or any other reason, which would prevent any one of you from giving the parties a fair and impartial trial, finding a verdict based only on the law and the evidence?"

None of the panel indicated that he had any bias or prejudice when interrogated on his *voir dire.* It is possible, of course, that the jurors may have heard the titling of the case when

they were sworn to try the issues, but there is nothing to indicate whether they did or not. However, the record does not disclose that any juror informed the court at that time of his disqualification.

The rule with respect to the bias or prejudice of a juror in certain cases is stated in 31 *Am. Jur., Jury,* § 183, in this manner:

> "A general, abstract bias or prejudice which a juror may entertain to a class of litigation will not of itself disqualify him from trying a cause, when it appears that he can set that feeling aside and can and will fairly and impartially decide the particular case solely upon the evidence and the instructions of the court; however, where such bias or prejudice is a fixed and abiding one * * * he is disqualified as a juror with respect to an action falling in such class."

In this State it is well settled that the scope of the questions propounded to jurors on their *voir dire* is largely in the discretion of the trial court. Of course, the only purpose of the inquiry is to ascertain the existence of cause for disqualification. *Grossfeld v. Braverman,* 203 Md. 498, 101 A. 2d 824 (1954). See also *Adams v. State,* 200 Md. 133, 88 A. 2d 556 (1952). However, it is also well settled that parties to an action triable before a jury have a *right* to have questions propounded to prospective jurors on their *voir dire,* which are directed to a specific cause for disqualification, and failure to allow such questions is an abuse of discretion constituting reversible error. *Alexander v. Grier & Sons Co.,* 181 Md. 415, 30 A. 2d 757 (1943); *Cohen v. State,* 173 Md. 216, 195 A. 532 (1937); *Beck v. State,* 151 Md. 615, 135 A. 410 (1926); *Whittemore v. State,* 151 Md. 309, 134 A. 322 (1926). With respect to the manner in which the trial judge should exercise his discretion we said in *Bryant v. State,* 207 Md. 565, 115 A. 2d 502 (1955), at p. 583:

> "In the exercise of * * * discretion, the trial judge should adapt the questions to the needs of each case in the effort to secure an impartial jury. Any circum-

stances that may reasonably be regarded as rendering a person unfitted for jury service may be made the subject of questions and a challenge for cause. Accordingly an examination of a juror on his *voir dire* is proper as long as it is conducted within the right to discover the juror's state of mind in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him."

The trial court ruled that the questions submitted by the plaintiff would not be asked because the effect, if not the intent, was to inquire into the jurors' religious affiliations, which the court thought would be improper. We do not say, or even intend to intimate, that the court was required to propound the precise questions submitted. The form of the questions to be asked is clearly within the sound discretion of the court. However, it is clear that the only question propounded by the court was not sufficient to determine possible cause for disqualification by reason of bias or prejudice or otherwise. The question asked was in a form so general that it is likely it did not sufficiently indicate to the panel of jurors what possible bias or prejudice was being probed. To ask the jurors whether they would be prevented from rendering a fair and impartial verdict by the fact that a party was a "religious corporation" — which they might not even realize meant a church — without informing them of the church involved or the position of the religious corporation in the suit would defeat the whole purpose of questioning jurors on their *voir dire*. We think there is no doubt that the court should have informed the prospective jurors that the action was a suit by Harriet M. Casey against Roman Catholic Archbishop of Baltimore, a corporation sole, for personal injuries allegedly arising out of an accident which occurred in St. Patrick's Church at Havre de Grace on October 2, 1954; that the suit was against the corporation only, as the holder of the legal title to the church building; and that it was not a suit against the Archbishop of Baltimore personally nor against him in his ecclesiastical capacity as such Archbishop. Then, the court should have propounded a question inquiring if there was any·

reason why any juror could not arrive at a fair and impartial verdict based on the evidence to be produced and the law applicable to the case to be set forth in the instructions of the court, or words to that effect. If the court had deemed it necessary, it could have continued to examine the jurors, or any one of them, in the manner suggested in *Bryant v. State, supra.* By so doing, the nature of the answer, if it disclosed cause for disqualification, would not necessarily have revealed the religious affiliation of the juror who made answer, and whether the juror was favorably or unfavorably disposed toward the Roman Catholic Church or toward an adherent to its religious faith.

Beyond this, however, even if the trial court was correct in its characterization of the question it propounded, the law is clear that, if the religious affiliation of a juror might reasonably prevent him from arriving at a fair and impartial verdict in a particular case because of the nature of the case, the parties are entitled to ferret out, or preferably have the court discover for them, the existence of bias or prejudice resulting from such affiliation. In other words, a party is entitled to a jury free of all disqualifying bias or prejudice without exception, and not merely a jury free of bias or prejudice of a general or abstract nature. Cf. *Adams v. State, supra.* And see *Miles v. United States,* 103 U. S. 304 (1881), [jurors asked if they believed in the truth of Mormon teachings] ; *People v. Reyes,* 5 Cal. 347 (1855), [conviction of Mexican Roman Catholic reversed because trial court refused to inquire if prospective jurors were members of the Know Nothing Party and had taken a secret obligation under which they could not possibly have given a Roman Catholic a fair and impartial trial] ; *Smith v. Smith,* 7 Cal. App. 2d 271, 46 P. 2d 232 (1935), [jurors asked if their religious belief in regard to divorce and remarriage might affect the verdict]. See also *Cleage v. Hyden,* 53 Tenn. 73 (1871). We hold that the examination of the prospective jurors on their *voir dire* in this case was not sufficiently comprehensive to assure the selection of a fair and impartial jury.

(iii). Deletion of Part of Pre-trial Statement.

Prior to the trial of this case, the plaintiff's witness, Ser-

geant Leo M. Moore, Jr., had made a signed statement in which he had said, among other things: "Mrs. Brown, *after noting* the floor was slippery, *said she hoped the insurance on the church was paid up*. Father made a remark about not worrying about it." (The emphasis added indicates the parts deleted). During the course of the trial, the defendant, desiring to use the statement to impeach the credibility of the witness, applied to the court for permission, which was granted over the objection of the plaintiff, to delete certain words (above emphasized), particularly the reference to the word "insurance," and to insert certain other words. After the deletion and insertion had been made the two sentences referred to read: "Mrs. Brown *made a remark that* the floor was slippery. Father made a remark about not worrying about it." (The emphasis added indicates the part inserted). The witness, when testifying on direct examination, had made no mention of insurance. It might be argued that the deletion favored the plaintiff in that the altered statement indicated that the priest had indirectly admitted liability, and that she need not worry about compensation for her injuries. However, the plaintiff, among other assigned reasons, insists that the alteration of the grammatical structure of the first sentence materially changed the meaning of what the witness had said in a part of the statement which not only referred to *insurance* but also, indirectly, to certain relevant facts which were clearly admissible. On the other hand, the defendant contends that the deletions were harmless. On the issue of whether it is proper to delete a reference to insurance from a pre-trial statement, written or oral, or a contract, memorandum or other paper writing, the cases and law writers tend to favor the deletion of the word on the ground of irrelevancy even though the exclusion might possibly distort slightly the meaning of the phrase in which it was used. A deletion is usually preferred in order to avoid the possible prejudicial effect the reference to insurance might have on a jury if the word was not deleted. See *Jones v. Gilland,* 137 Cal. App. 2d 486, 290 P. 2d 329 (1955) ; *Sapp v. Key,* 287 S. W. 2d 775 (Mo. 1956) ; *Anderson v. Enfield,* 244 Minn. 474, 70 N. W. 2d 409 (1955) ; *Capozi v. Hearst*

*Publishing Co.,* 371 Pa. 503, 92 A. 2d 177 (1952) ; *Derrick v. Rock,* 218 Ark. 339, 236 S. W. 2d 726 (1951) ; *Wilbur v. Tourangeau,* 116 Vt. 199, 71 A. 2d 565 (1950) ; *Socony Vacuum Oil Co. v. Marvin,* 313 Mich. 528, 21 N. W. 2d 841 (1946) ; *Jeddeloh v. Hockenhull,* 219 Minn. 541, 18 N. W. 2d 582 (1945) ; *Kuhn v. Kjose,* 216 Iowa 36, 248 N. W. 230 (1933) ; *McCormick, Evidence* (1954), § 56; 7 *Wigmore, Evidence* (3d ed. 1940), § 2113(a). But compare *Rodgers v. Ashley,* 207 F. 2d 534 (3d Cir., 1953) ; *Fleischman v. City of Reading,* 388 Pa. 183, 130 A. 2d 429 (1957) ; *Vanni v. Cloutier,* 100 N. H. 272, 124 A. 2d 204 (1956) ; *Guarnaccia v. Wiecenski,* 130 Conn. 20, 31 A. 2d 464 (1943) ; and especially the Maryland cases of *Rhinehart v. Lemmon,* 181 Md. 663, 29 A. 2d 279 (1942), and *Takoma Park Bank v. Abbott,* 179 Md. 249, 19 A. 2d 169 (1941), which did not, however, involve the exact point now under consideration.

In the *Rhinehart* case, *supra,* even though a "farm bureau" sign on an automobile seen at the scene of the accident carried a suggestion of insurance, it was held that:

> "[R]eference to * * * [the sign] as a mark distinguishing the car would be relevant and unobjectionable. A suggestion of the possession of insurance is not to be avoided at the cost of suppressing evidence material to the establishment of the cause of the accident and liability of the defendant sued for damages."

This Court has often recognized that when the reference to insurance is made by the defendant, he is in no position to move for a mistrial. *International Co. v. Clark,* 147 Md. 34, 127 A. 647 (1925) ; Note, 5 Md. L. Rev. 422 (1941). In the *Takoma Park Bank* case, *supra,* an action against a bank by the lessees of a safe deposit box for the loss of the contents of the box, the Court held that it was proper for the trial court to admit a statement made by the vice-president of the bank that the plaintiff had nothing to worry about since the bank was protected by insurance. At p. 265, we said:

> "It will be noted that the defendant itself, in mentioning insurance, first injected it into the case. On no grounds recognized by reason or justice should it

now be heard to complain because its statement went before the jury when in the first instance * * * [defendant] suggested it as an answer to the plaintiff's loss. * * * [Defendant], therefore, having injected insurance apparently as its reason and the only reason for the relaxation of due diligence in protecting the plaintiff's property is certainly not injured by this ruling."

The Maryland cases previously referred to are not directly in point since the issue here is whether the defendant has a right to delete a reference to insurance *before* any mention of insurance is made at the trial. Those cases involved only situations where the defendant had *already* introduced evidence of insurance and then sought a mistrial. However, it should not be overlooked that the *Takoma Park Bank* case, *supra,* is also authority to hold that the remark made by the priest relative to "not worrying about it" could be construed as an excuse for relaxation of care and diligence, and therefore relevant to the issues in the instant case. At p. 265, we also said:

"It cannot be said that the statement made by the executive vice-president in answer to appellee's charges of the bank's neglect in failing to protect his property would not to some extent be relevant as indicating to reasonable minds an excuse on the bank's part for a relaxation of care, diligence and responsibility, because undoubtedly it was relevant to the very issue in the case."

See also *Olson v. Sharpe,* 36 Tenn. App. 557, 259 S. W. 2d 867 (1953), in which it was held that the trial court did not abuse its discretion in permitting the plaintiff to introduce a certificate of indemnity insurance for the purpose of showing the existence of a master-servant relationship, which was one of the issues in the case. The statement in *McCormick, Evidence* (1954), § 168, is also pertinent:

"[E]vidence of the fact of * * * insurance is inadmissible unless it falls within some one of a group of exceptional situations. In these situations pre-

sumably the trial judge's discretionary power to exclude could still be invoked if he should consider that the need for and value of the evidence were outweighed by its likelihood of misuse by the jury. What are those exceptions?

"[T]he admission of a party bearing on negligence or damages may include a reference to the fact of insurance which cannot be severed without substantially lessening the evidential value of the admission."

In a case such as this—where the defendant desires to introduce a signed statement into the evidence, but without the reference therein to insurance, for the purpose of impeaching a witness—and where the deletion of the phrase in which the reference appears materially changes, in one way or another, the meaning of what the witness has said in the statement as to facts which are relevant and clearly admissible, as the statement in this case does—we hold that the defendant must elect between an introduction of the whole statement without alteration or none of it. Where the deletion would produce a substantial alteration of the meaning of the phrase in which the reference to insurance was used, the exclusion should not be permitted.

### (iv). Instructions as to Damages.

Strictly speaking, there was no assignment of error in the instructions with respect to damages. After the original instruction to the jury had been made, the plaintiff objected to two omissions in the charge by pointing out to the trial judge that he had omitted any mention of the plaintiff's "inability to do her household duties," and that the court had denied her "any recovery for her crippled condition." The judge by his amended charge instructed the jury that the plaintiff was entitled to a "fair and reasonable [sum] for the * * * loss of use of her hands in personal or household matters, in addition to the loss of earning power." On appeal the plaintiff contends that the court did not include in the amended instruction the omissions from the original instruction except in the alternative. She insists that a proper instruction would have informed the jury that she was entitled to com-

pensation for her crippled condition and disability, not only with respect to her earning power but also with respect to her ability to perform her household duties and other personal matters. Even if we assume that the plaintiff's contentions are correct, we are without authority to consider the matter for the simple reason that she failed to object to the amended instruction pursuant to Maryland Rule 554 d. We think it is clear that Rule 554 is as applicable to an amended instruction as it is to an original instruction, and that a party must fully comply with the requirements of the rule at every stage of the instructions in order to preserve his rights; otherwise there is nothing for us to consider on an appeal.

However, in this instance, since the case is to be retried, we think it is desirable, if not necessary, for us to comment briefly on the instructions of the court with respect to damages. If the original and amended instructions are read together as we read them, we think it is clear that the charge as a whole contains a fair statement of the law with respect to damages in a case such as this. See *West v. Belle Isle Cab Co.*, 203 Md. 244, 100 A. 2d 17 (1953). The law on the subject was fairly covered by the instructions in the present case, and that is all the rule requires. We have repeatedly stressed the fact that we cannot put the "trial judge in a strait jacket and prescribe or adopt a formula to be used and followed by him," with respect to his instructions to the jury. *State, use of Taylor v. Barlly,* 216 Md. 94, 140 A. 2d 173 (1958), and cases therein cited. We have also held that it is sufficient if the question or point of law involved is "fully and comprehensively covered" by the judge in his instructions. *Ager v. Baltimore Transit Co.,* 213 Md. 414, 132 A. 2d 469 (1957).

For the reasons assigned the judgment must be reversed, and the case remanded for a new trial.

> *Judgment Reversed and Case Remanded for a New Trial, the Appellee to Pay the Costs.*

HAMMOND J., filed the following dissenting opinion.

I agree with the Court that the trial judge should have

asked the jurors on *voir dire* substantially the questions that appellant's counsel requested. I see no need to reverse, however, for prejudice was not shown and is not fairly inferable. The jurors sitting on front benches, but a few feet from the clerk, hardly can fail to have heard the names of the parties when the case was called for trial a few minutes before Judge Niles asked the question he did as to possible prejudice as to a "religious corporation". Immediately after he asked it the jurors again heard the names of the parties, when they were sworn. No juror could have failed to know that the Roman Catholic Archbishop was the religious corporation to which possible prejudice was to be related and no juror felt disqualified.

The Court's decision on the use of the altered statement of the witness Moore seems to me wrong and unfortunate. It is still the rule in Maryland—whether or not it is a good or bad rule—that negligence cases are supposed to be tried and determined as if insurance were not involved—even negligence cases against charitable corporations. If the defendant brings out the fact that he is insured generally he may not call for a mistrial even though, in the words of this Court as to juries in *International Co. v. Clark,* 147 Md. 34, 42, "it seems to be natural and a weakness of human nature to allow the fact that the record defendant will not have to pay the judgment, to influence them in their verdict * * *."

If the aim is to continue to be to keep from the jury whether or not the defendant is insured, a defendant who desires to bring out the truth by use of a statement that contains a reference to insurance should be allowed to alter the statement even to the point of slight distortion of meaning, and use it.

A fundamental and primary purpose of a law suit is to reveal the true facts. Because a law suit is an adversary contest is no reason to put difficulties in the way of this purpose by hampering a party who seeks to show facts favorable to him. The Court has erected such a road block by finding a distortion of meaning where none existed and thus requiring a defendant to elect between not using a paper calculated to draw out the truth and using it at the disadvantage of letting the jury know he is insured.

Father Monmonier's reply to Mrs. Brown's statement that the floor was slippery and she hoped the church's insurance was paid up—that she was not to worry about it,—could have meant any one or more of a number of things. It could have been intended, for example, to say politely, that the matter was none of Mrs. Brown's business, or to say that which ought to be done under the circumstances would be done. As altered the statement said the floor was slippery and Father said not to worry about it. The reply to Mrs. Brown's remark, as changed, meant just as much or just as little as the reply to her original remark. Certainly there was no substantial alteration of meaning, or even the slightest of distortions.

It may well be that the rule as to the jury's knowledge of insurance should be changed. If so, it should be done directly by the Legislature. The Court should not, I feel, change it piecemeal by requiring a defendant to reveal the fact he is insured or lose the use of a weapon effective in bringing out the truth.

By straining to find an altered meaning, where none existed, the Court has begun the change in the instant case, it seems to me.