## Siek v. Majewski

*Robert L. Ceisler*, for plaintiff.

*Francis H. Patrono* and *Richard DiSalle*, for defendants.

SWEET, P. J., September 9, 1965.—This is another and, hopefully, the last round in the protracted litigation which arose out of an automobile accident May 1, 1959, in Chartiers Township, Washington County, Pa. As a result of this accident, Robert E. Siek sued Henry Majewski and Lewis K. Tressler in trespass at May term, 1959, no. 773. The Tresslers sued Henry Majewski in a proceeding at May term, 1959, 832. (Majewski also sued Tressler at September term, 1959, no. 20, for his personal injuries, but this came to naught.) Siek was riding with Majewski when what

might be called an "over-the-center-of-the-road" collision with Tressler took place.

In an earlier opinion at this number, we affirmed the verdict won by Robert E. Siek against Henry Majewski alone, but reduced it from $27,500 to $22,500. However, the real area of disagreement between Siek and Majewski was specifically excluded from the personal injury case by the trial judge, the Honorable David H. Weiner, and the question which we have in these proceedings, the validity of an alleged settlement, was reserved for separate action.

It seems that while the proceeding in which the Tresslers were plaintiffs and Majewski defendant, May, 1959, no. 832, was underway and almost at a conclusion, Judge Weiner called the members of counsel into chambers for settlement negotiations. In attendance were Francis H. Patrono, George K. Hanna, and Richard DiSalle, Esqs., all representing Majewski—the first for his carrier and the others privately; Mr. Milton Rosenberg and Mr. I. C. Bloom of Bloom, Bloom, Rosenberg & Bloom were in attendance on behalf of Tressler as a plaintiff. Mr. Thomas L. Anderson represented Tressler as a defendant and additional defendant. It was obvious that the Tressler case, which ultimately resulted in a verdict of $56,000, and the Siek case, which ultimately resulted in a verdict of $27,500, were beyond the capacity of the insurance carrier for Majewski to settle within the modest policy limits. Majewski was therefore called upon to make a voluntary payment if he was to avoid the imminent probability of a substantial verdict against him.

Two things then happened which finally gave rise to this problem. Majewski insisted that if he was to make any payment to get rid of the Tressler case, he also wanted to dispose, in a single transaction, of the Siek case, not then on trial, but hanging over him. Someone, whether the Sieks personally, the policy of

the Bloom office, or who, we do not know, wanted to arrange it so that none of the Majewskis' actual money went to the Siek family, but all to the Tresslers. This little bit of delicacy has given rise to some difficulty. Vincent R. Massock, Esq., now deceased, and at that time the most frequently engaged plaintiff's attorney at our bar, represented Siek. Judge Weiner sent for him, too, after learning Majewski's desire to settle the entire package. Only counsel participated in these proceedings except to the limited extent to which Majewski was admitted to the chambers. At no time that morning were any of the Tresslers or any of the Sieks in Judge Weiner's chambers. It was arranged that Majewski would pay $7,000.

The record of the proceedings held on September 14, 1960, shows that the American Casualty Company paid $17,500. Ten thousand five hundred dollars of the insurance company's money and all of Majewski's money went to the various members of the Tressler family, as set forth in the proceedings (p. 3) : "In the case of Robert E. Siek the entire amount, $6,250, is being paid by the American Casualty Company". It appears in the record, and it is obvious that this is a single transaction.

On page 7 of the record of the settlement proceedings, Mr. DiSalle said, "Let the record also show that Henry Majewski and Helen Majewski have handed to I. C. Bloom, Esq., a check of the Pittsburgh National-al Bank No. 2115 dated September 14, 1960, in the amount of $7,000 payable to the order of Henry Majewski and Helen Majewski and endorsed by the said payee to the order of Bloom, Bloom & Yard, attorneys for Lewis K. Tressler, administrator, guardian and individually".

There is no doubt that it was the intention of everyone who participated that Majewski's payment of $7,000 was to exonerate him and his wife from all lia-

bility out of the accident. Mr. Patrono said at the time, before the court approved the settlement (p. 2): ". . . the various cases have been settled to the satisfaction of all parties with the exception of the insurance carrier for Lewis K. Tressler as follows: . . . in the case of Robert E. Siek, $6,250".

The question now arises whether Attorney Vincent R. Massock had authority to enter into the settlement. The client, Robert E. Siek, and his brother and sister, who handle most of Robert's business for him, maintain that they were never informed of and never authorized the $6,250 settlement. The case was tried to verdict anyhow, because the evidence of the settlement was disputed and a verdict of $27,500, reduced by this court to $22,500, resulted. All evidence concerning the settlement was excluded from the trial and reserved for these proceedings. Plaintiff's claim that since they did not expressly authorize this settlement, it is not binding on them, and they are entitled to the full amount of the verdict, as modified by the court, plus interest and costs. Defendant Henry Majewski, on the other hand, claims that he paid $7,000 into the settlement of all outstanding claims against him over and above the amount covered by his insurance. Majewski does not claim he has direct proof of Massock's authority to settle, but says that it can and should be inferred from the circumstances of the settlement.

The Tressler case against Majewski was being tried, and all three Sieks were present on January 14, 1960. While the lawyers were discussing possible terms of settlement, Mr. Massock went out and was seen talking to the Sieks by some of these people attending the conference. No one knows what, if anything, was said between Massock and the Sieks save Massock (who is dead) and the Sieks, who, of course, stand to lose a very substantial sum if it develops that Massock's participation in the settlement was authorized.

The general rule, of course, is that ". . . an attorney cannot, without more, compromise a client's claim. There must be proof of authority beyond that implied by the relationship if the client is to be bound by the acts of his attorney not within the scope of his ordinary duties. . . .": Quest's Estate, 324 Pa. 230 (1936).

The leading recent case is Sustrik v. Jones & Laughlin Steel Corporation, 189 Pa. Superior Ct. 47 (1959), which, by coincidence, comes from Washington County. Sustrik held that ". . . the act of an agent or attorney affecting the relation of his principal or client, with a third person, done in accordance with his principal's *manifestations of consent although without special authority,* may bind his principal or client". (Italics in original.) The mechanical facts in Sustrik are almost the same as in our case here. Attorneys Mc-Closkey and Schmidt were negotiating in Judge Weiner's chambers: "Plaintiffs' counsel then left the judge's chambers to discuss the matter with his clients and he was observed in consultation with them outside the courtroom". He came back in and settled. The settlement was upheld, and the Superior Court even approved a refusal of the trial judge to take testimony on the claiming parties' petition which averred that they had given no such authority.

That holding relies in part on Restatement, Agency §159, which we quote:

"A disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his apparent authority if made in proper form and with the understanding that the apparent principal is a party. The rules as to the liability of a principal for authorized acts, are applicable to unauthorized acts which are apparently authorized".

Comment "b" thereto says:

"A person not authorized to do so but purporting to make a contract on behalf of a principal subjects him

to liability to the same extent as if the contract were authorized if, under the circumstances, the principal may fairly be charged with responsibility for the third person's misapprehension as to the agent's authority".[1]

It is also noted that Restatement, Agency §36, says, "Unless otherwise agreed, an agent is authorized to comply with relevant usages of business if the principal has notice that usages of such a nature may exist".

In this case, I find as a fact that Attorney Massock was present in Judge Weiner's chambers with Attorneys I. C. Bloom, Milton D. Rosenberg, Richard DiSalle, George K. Hanna and Francis H. Patrono. The package of cases was settled there, and Henry Majewski submitted his certified check for $7,000 to meet his part of the package settlement.[2] Massock reported to the others that he had authority to do this and because he was in frequent conference with the Sieks, it was entirely reasonable to conclude that they did know and did approve what Massock was doing. The case is so much like Sustrik, supra, that we may and do base this holding on the authority of that case.

We have a comparatively small bar in Washington County, and a relative handful of lawyers conduct most of the personal injury litigation for claimants and carriers. Although there is no testimony to this effect in the record, the hearing judge, for many years active in this field himself, knows—and no one will deny— that Massock had settled literally hundreds of cases and these other lawyers, Bloom, Rosenberg, Patrono, Hanna, DiSalle, and Anderson, had settled literally hundreds of cases among themselves in various proportions. It was almost the invariable practice, when settlements were made on the courthouse steps or in the judges' chambers, for the lawyers to speak with

---

[1] For our purposes, this is not changed by the revision of 1958.

[2] This constitutes a "change of position" within the meaning of Restatement, Agency §8b.

their clients privately and then settle with the other lawyers without the attendance of the client. What was done here was what has been done daily in our courts, at least since World War II.

Perhaps some review of the rules covering the rights of attorneys to bind their clients would be useful here. What seems to be helpful general authority for Siek's position, Capozi v. Hearst Publishing Company, Inc., 371 Pa. 503 (1952), is not helpful here because " '. . .the plaintiff had a contract with his attorney whereby the case could not be settled without the permission of the plaintiff' ". No such contract is claimed here and the rights of the parties inter se depend on the general law. A good deal of this is reviewed in Township of North Whitehall v. Keller, 100 Pa. 105 (1882), which is generally cited for the proposition that the attorney may not compromise plaintiff's collection of a liquidated amount for less than what is due without authority.

"When a claim is put into the hands of an attorney for collection, without further instruction, it is generally understood to be for the purpose of having it enforced by legal process, and it is not presumed that the attorney either can or will, without process, compromise and settle it on such terms as either his judgment or caprice may dictate. We do not say that such power can never be exercised by the attorney, without express warrant from his client, for an implied power may result from the character of the claim requiring collection, and the circumstances connected with it. So, *if* on the trial of the case *the attorney should consent to a judgment less than the amount due, a court would not ordinarily, in relief of the client, set aside such judgment*". (Italics supplied.)

In that same case, Edward Harvey, Esq., arguendo, said this:

"In Pennsylvania the scope of an attorney-at-law's authority is very extensive: it includes the right to

confess judgment in a pending action and to waive an appeal; to stay execution on a judgment on the entering of security; and to compromise and settle the suit. If he acts in disregard of instructions, the client's remedy is an action against him: (citing many cases)".

In Yarnall v. Yorkshire Worsted Mills, 370 Pa. 93 (1952), it was said that "Indeed, a client makes his attorney's act his own if he does not disavow it the first moment he receives knowledge that his attorney has transcended his authority".

In Baumgartner v. Whinney, 156 Pa. Superior Ct. 167 (1944), we find that: "Whenever compromises have been set aside it has appeared that the client has unequivocally repudiated the unauthorized act immediately after learning of it, sometimes within a few days, and always within a reasonable time".

While it is apparent here that the Sieks did not accept the settlement, their testimony falls short of square disavowal, e.g., Jessie Siek Alberta, who had authority to manage the business for Robert. Direct examination by Mr. Ceisler:

"Q And at that time (the second or third week in January) Mr. Massock told you that he had settled the case or what?

"A He offered $6,200.

"Q And what did you tell him?

"A I said with all the medical bills and all he had, it would pay for medical bills and that was it, so he offered to cut his fee in half".

"Q Let's go back. Mr. Massock offered to cut his fee in half if you accepted the $6,200?

"A That's right.

"Q Did you accept?

"A No, we didn't.

"Q What if any, effort did you make through Judge Weiner to get the case away from Mr. Massock?

"A Well, we went to Judge Weiner and we explained what happened".

Henry Siek agreed that everything Jessie said was accurate, and his testimony would be the same on those points.

Robert Siek, plaintiff himself, who is barely competent, (direct examination by Mr. Ceisler):

"Q Bobby, in your case where you were hurt in Majewski's truck, who was in charge of handling that case for you? What member of your family?

"A My sister.

"Q What's her name?

"A Jessie.

"Q Did you at any time authorize Vincent Massock to settle the case for you for $6,250?

"A I never did talk to him; I wouldn't know what to do.

"Q You wouldn't know what to do?

"A No."

We would like to suggest that the settlement of personal injury cases might very well become an exception to the general rules regarding settlement and compromise recited hereinbefore. It is the constant custom in this county (see Judge Weiner's testimony), and probably elsewhere in Pennsylvania, for personal injury cases to be settled between attorneys, often on the courthouse steps. After trial has begun, it is frequent for the judge to call counsel into chambers to negotiate a settlement. The parties normally are not present.

There are logical reasons why personal injury settlement is different from the compromise of assumpsit matters, lease troubles, claims against estates, etc., which have given rise to the prevailing rule. Often a businessman knows more about his business than his lawyer does, but it would be uncommon and perhaps even suspicious for a plaintiff to be more experienced in personal injury than his counsellor. In most instances, the personal injury plaintiff has little idea of the value of his case and, characteristically, will over-

price it. The lawyers handling personal injury for plaintiff are often specialists, experienced and shrewd in the evaluation of a case. The numerous subtle factors which go into the makeup of a personal injury settlement are not generally ones which would be appreciated by a layman.

While the uninsured defendant is often with us, it will come as no surprise to the profession to note that most settlements involving important money are made by, or on behalf of, insurance carriers. These are invariably incorporated, and do their business through employes and lawyers. Almost never do the actual executive officers of insurance companies make the settlement commitment; nor does the board of directors meet to pass on them. The local adjuster, the Pittsburgh claims manager, or occasionally the home office claims examiner generally make offers of settlement, usually through defense counsel. If this case were lined up the other way, and plaintiff were demanding that an insurance company go through with a settlement which its attorney had agreed to, it would be considered shocking to vacate the settlement because the attorney misspoke.

The practical difficulty standing in the way of any rule that the party himself or itself must openly and in so many words make or confirm the settlement is that such rule would impose an unbearable burden on personal injury litigation, as currently conducted.

Although when a case is on trial, the parties are generally at hand, as the Sieks are here, cases are regularly settled on eve of trial when the parties are still at home. One fears that if a contrary result were reached as a legal conclusion here, documentary proof would commonly have to be offered proving the authority of the defense counsel to commit the company in each case, and of plaintiff's counsel to agree.

We reach this result more easily because of the

equities here. If we discharge the rule, Majewski will have received nothing for his $7,000, and he will have to pay substantially more. If we make the rule absolute and mark the judgment satisfied, the Sieks may pursue the still open and substantial Massock estate for the shortage and if they can convince the proper trier of fact that Massock acted without their authority, they can be made whole there.[3] If he had their approval, no one is hurt.

Under all these circumstances, therefore, it seems the just and proper thing is to make the rule absolute, and we so do.

---

[3] In suit at No. 464, February term, 1963.