Fleischman *v.* Reading, Appellant.

Argued January 9, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Ralph C. Body,* with him *John C. Clemmens, C. Wilson Austin,* City Solicitor, and *Body, Muth, Rhoda & Stoudt,* for appellant.

*Charles H. Weidner,* with him *Stevens & Lee,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 25, 1957:

The negligence of the driver of the defendant's truck in this case was pronounced, flagrant, and practically uncontradicted. Halted on the wrong side of the road, he pulled out into a lane of traffic not his own, and collided with a car being driven by the plaintiff, George M. Fleischman, inflicting injuries which the jury evaluated at $20,000. The defendant municipality has appealed to this Court seeking judgment

n.o.v., on the contention that the plaintiff was guilty of contributory negligence. It also asks, in the alternative, for a new trial, advancing reasons which will be discussed later.

I.

Reconstructing the accident with the testimony which best fits into the plaintiff's account as to how the mishap occurred (as we are required to do in an appellate review of the case), the following narrative emerges. On May 10, 1952, at about 2 o'clock in the morning, as he was returning from an American Legion activity, the plaintiff, while driving along Lancaster Avenue in the City of Reading, observed, behind some cars parked on his right side of the road, what he described to be "a little light on the ground at the cars." Since the light was not in his path of travel he continued on his way until, when about 35 feet away from the point which later turned out to be the place of collision, the slanting broadside of a truck loomed before him. He tried to avoid the obstacle by swinging further to his right but the interval of time and space within which to accomplish the hurried maneuver was too short, and the inevitable crash followed.

In support of its argument for judgment n.o.v. the defendant urges application of the rule announced in The Motor Vehicle Code and many of our decisions that the operator of a motor vehicle must have it under such control that he can stop within the "assured clear distance ahead." The defendant interprets "assured clear distance ahead" to mean more than what is within the purport of its language. "Assured clear distance ahead" means only what it says: a clear distance that is assured, that is, one that can reasonably be depended on. The rule does not mean that the motorist must carry in his mind every possible series of combinations which could conspire against him, and

that he must transport ready-made solutions to overcome all fortuitous hazards which suddenly face him. *Assured* does not mean *guaranteed.* When a driver approaches the crest of a hill, there comes a moment when, because of the convexity of the highway, he has practically no guaranteed clear distance ahead, but he can reasonably be assured that no one will be insane enough to approach the crest of the road from the other side of the summit, using the contrary lane of travel. If such a predicament should develop and a collision result, the motorist on his own side of the thoroughfare cannot be declared guilty of contributory negligence as a matter of law on the theory that he did not have an assured clear distance ahead. Assured clear distance ahead does not embrace a state of affairs where a truck lurks behind parked cars and then suddenly moves into the highway. Assured clear distance does not include a situation where a vehicle is ambushed in the shadows of other parked cars and then, without warning, charges into the street.

In the case at bar, Fleischman did have an assured clear distance ahead of him even when he saw the light on the defendant's truck 100 feet away. It was only when the truck moved into the plaintiff's path of travel, that the assured clear distance became un-assured. By this time, however, fate's course had been shaped beyond man's alteration.

In the case of *Schofield v. Druschel,* 359 Pa. 630, the accident occurred when the defendant's unilluminated car travelling on the wrong side of the road collided with another car on its own side of the road. In the ensuing lawsuit it was argued by the defendant that the driver of the decedent's car was guilty of contributory negligence as a matter of law. We said: "This Court has repeatedly held that a driver at night is not bound to anticipate all possibilities. It is the

duty of the driver of a vehicle to have his car under control at all times. Having one's car under control means that in any situation reasonably likely to arise he will be able to stop his car before doing injury to any person or property . . . One is not bound to anticipate negligence of another. More particularly, Schofield was not bound to anticipate that Druschel would violate the Motor Vehicle Code by driving on his wrong side of the road and without lights. It cannot be said as a matter of law that this was a situation 'reasonably likely to arise under the circumstances.' "

In the case of *Long v. Pa. Truck Lines, Inc.*, 335 Pa. 236, the plaintiff was injured when his car collided with the defendant's which was travelling in a direction opposite to that allowed by law. The lower Court reversed a verdict returned in favor of the plaintiff, asserting that since the evidence showed that the accident happened 50 feet from a curve, the plaintiff had ample time within which to stop his car had he been operating it carefully. The Trial Court said further that: "It was his [the plaintiff's] duty to so drive his car that when he turned the curve he could stop it within that distance necessary to avoid a collision with what might suddenly loom up in front of him in the road after he had come around the curve." This Court rejected the lower Court's reasoning and judgment, saying: "Appellant was not under a duty to anticipate that the driver of a vehicle coming in the opposite direction around the curve would occupy the center of the highway in violation of the law of the road."

The plaintiff in this case had no way of foreseeing the zigzagging of the defendant's truck which was collecting garbage on either side of the street, and thus tacking like a sailing vessel moving in the face of headwinds.

In the case of *Wilson v. Con. Dressed Beef Co.*, 295 Pa. 168, the plaintiff was injured when her car came into contact with the defendant's truck which was taking a diagonal course. There also, the defendant charged the plaintiff with contributory negligence. This Court said: "The question of contributory negligence was also for the jury . . . The truck, going at twenty miles an hour, was not in her view over three seconds before the accident, and for only a fraction of that time did the truck appear to be turning against her. Whether in that brief time Mrs. Wilson could have changed her course to the right and escaped the collision is problematical, and was for the jury. 'Negligence cannot be imputed because of the failure to perform a duty so suddenly and unexpectedly arising that there is no opportunity to apprehend the situation and to act according to the exigency." We affirm the lower Court's refusal to enter judgment n.o.v.

## II.

On May 13, 1952, that is, three days after the plaintiff had undergone a serious operation, and while his arm with a wire plunged through bones in his hand, was suspended in mid-air traction, an unintroduced man entered his darkened room in the hospital, raised the window shade, and proceeded to ask questions, to which the plaintiff, considering his pain and shock, replied to the best of his ability. When three sheets of paper had been filled with interrogations and answers, a pen was thrust into the plaintiff's uninjured hand and he scrawled his signature. At the trial, defendant's counsel cross-examined the plaintiff at length on the answers he had made in the hospital. At no time did defendant's counsel indicate to the Court and jury the identity of the person who was responsible for the statement. Upon redirect examination, plaintiff's counsel asked the plaintiff if he knew who it was who

had put the questions to him at the hospital. The plaintiff replied that the visitor was a total stranger to him, and then the following colloquy occurred: "Q. Did you know later who he was? A. Yes, he left his card on the dresser, and a visitor a day or two later told me a certain man was in to see me because he must have left a card, and I didn't know anything about it. Q. Who was the man that took it? A. An insurance man. Q. And what did his card say? A. I don't remember."

Defendant's counsel moved for the withdrawal of a juror on the ground that insurance had been mentioned, to the prejudice of his client. The motion was refused and the defendant urges here that the lower Court's refusal to declare a mistrial constituted error which calls for a new trial.

It is quite obvious from the record that there was no attempt on the part of plaintiff's counsel, or on the part of the plaintiff himself, to disclose that any verdict recovered against the defendant would be paid by an insurance company. It is also obvious that the question put by plaintiff's counsel was one which the situation practically demanded. Defendant's counsel had questioned the plaintiff for 14 printed pages on what information he had given the person who wrote up the statement in the hospital, but at no time was the curtain raised on the individuality of the statement-taker, whom, if anybody he was representing, and what purpose lay behind his inquisition of the plaintiff. Was he a detective? A policeman? A statistician? A traffic consultant? Was he a phantom?

When an uninvited visitor invades a hospital room to question a sick or injured person, and the information allegedly taken from the patient is read to a jury in a courtroom, the jury should be offered some enlightenment as to the authority of the visitor who

placed a pen in the hand of the invalid and bade him write. Especially is this true when the injured person declares, as Fleischman did in the case at bar, that he never saw the statement, and, in addition, denies the accuracy of many of the answers attributed to him. Here, the plaintiff denied, contrary to what he is charged with having declared in the statement, that he had two beers before the accident, he denied that he told his wife to wait up for him and that then they would go out for a "few beers," he denied that he had said he was travelling 30 to 35 miles per hour at the time of the collision, he denied that the first time he saw the truck it was 15 feet away, and he denied that he had talked about his doctors. With so many categorical refutations to the alleged assertions in the statement (and there were more than here enumerated), the inquiry naturally arises in the mind of any impartial observer as to who was telling the truth. But in deciding who was telling the truth it was first necessary to know who were the antagonists in the contest of veracity. At the end of the cross-examination on the hospital statement, two adversaries faced each other in the arena of disputed probity: on the one side Mr. Fleischman and on the other side Mr. Shadow. So far as the jury was concerned, Mr. Shadow could even have been someone speaking for the law, someone representing the Court, someone authorized to conduct an impartial interrogation. If the jury came to any such conclusion the defendant would enjoy a benefit it was not entitled to.

Candor and fair dealing dictate that when an insurance company undertakes to participate in a trial to the extent that it produces a paper, allegedly signed by the plaintiff, who repudiates the paper, the insurance company should not be allowed to conceal its interest behind a misty curtain of anonymity. An in-

surance company which is actively defending a lawsuit for damages has as much interest in the outcome of the trial as the plaintiff and cannot claim immunity from rules which are binding on its adversary, the plaintiff.

Allowing to every insurance investigator credit for honesty, integrity, and square dealing, he is still a partisan defending the interests of his employer to the best of his ability. Whether, in his zeal to properly represent his employer, or, whether through human error, he gives the plaintiff the worst of it in any report he makes to the insurance company, which report is later read in court, it is up to the jury to determine, between the investigator and the plaintiff, who is entitled to the greater credibility. However, before the jury can make this decision, the mask of anonymity must be lifted, and the investigator given a local habitation and a name.

In the case of *Taylor v. Ross*, 78 N.E. 2d 395 (Court of Appeals of Ohio), the plaintiff was cross-examined on a statement taken by an insurance representative. When counsel asked the plaintiff to indicate for whom the investigator was investigating, he was not permitted to answer. The appellate Court of Ohio declared this to be error: "It is our judgment that the court committed error in refusing at that juncture to accord to the plaintiff the opportunity to explain fully the circumstances under which the statement to **Mr.** Heyduck was taken including his representations as to the Insurance Company . . . Manifestly the effect of the answers, unexplained, to the questions in the statement to Heyduck were most damaging to the plaintiff's case and many of them admitted to have been made by the plaintiff, or at least not denied by her, were in direct contradiction of her sworn testimony on material and determinative elements of her case. If, then,

the circumstances under which the statement was taken would have the effect of supporting the truth of the testimony of the plaintiff, she was entitled to have this factual development brought to the attention of the jury and passed upon."

The Court then made this cogent declaration: "An insurance company is not sacrosanct. It has an interest in a lawsuit in which it may be called upon to pay all or at least a part of a judgment if against the insured. That such interest may at times cause those who represent it to offend against the proprieties is not without the bounds of reason. It is appropriate and proper that a court should protect it in all of its legal rights but when, and if, a factual situation develops which, if true, establishes an overreaching on the part of its representative in securing information to its advantage, surely opportunity to show this fact will not be denied a party affected."

On the same subject the Supreme Court of Oregon expressed itself as follows: "The statement offered in evidence not being in the handwriting of the witness, and being in some respects different from her testimony in chief, counsel for plaintiff had a right on redirect examination to disclose the interest the party writing the statement had in the matter. The answer in which the matter of insurance appeared was not responsive to the question asked. Counsel could not foresee that such an answer would be made. The answer does not show that defendant, or any one else, was insured. Counsel had a right to have the witness disclose who prepared the statement. When parties interested, either directly or indirectly, in the result of litigation, send their agents to interview witnesses and prepare statements for such witnesses to sign, the jury has not only the right to know who such agents are, but whom such agents represent, when a discrep-

ancy arises between the testimony given by the wit-
ness on the stand and the statement prepared by such
agent." *Webb v. Hoover-Guernsey Dairy Co.,* 4 P. 2d
631.

In all events the answer made by the plaintiff, to
which the defendant here objects, was quite an innocu-
ous one. It did not name any insurance company, it
did not say that the defendant was insured. In a simi-
lar situation, the United States Court of Appeals,
Third Circuit, said: "The complaint is made that one
of the witnesses mentioned an insurance company in
saying to whom he gave a statement. Under the cir-
cumstances this is not grounds for a new trial. There
was no statement that the insurance company was the
one with which the defendant was insured and the
company could as well been one who insured the plain-
tiff or his employer as the one who insured the defend-
ant." *Rodgers v. Ashley,* 207 F. 2d 534.

An then, as a final word on this subject, it is to be
observed that where a financially responsible munici-
pality is involved, the question as to whether there is
insurance coverage for liability is of but little signifi-
cance to a jury.

### III.

The defendant is dissatisfied with the amount of
the verdict, urging that it is excessive to the point that
only a new trial can correct its exaggerated character.
A reading of the record fails to show that the amount
is out of consonance with the nature of the plaintiff's
disablement. The doctor's and hospital bills, totaling
some $1,000, do not in themselves reflect the serious-
ness of the loss sustained by George Fleischman. While
it is true that in the usual case the amount of medical
expense incurred up to the time of trial offers some
indication of the gravity of the damage done to one's
physical structure, it cannot be accepted as an inflexi-

ble measure of bodily disrepair. For instance, the cost of amputating a leg or even removing an eye may be comparatively small, but who would say that the medical outlay in either of these tragedies would be a standard to employ in computing the appalling loss suffered by the patient?

The plaintiff's left elbow was crushed in such a manner as to reduce the bones in that highly delicate joint to a disconnected jumble of fragments. In attempting to reconstruct the elbow, which is a highly engined piece of mechanism turning on a jewel, the doctors discovered that the most precious item in the ensemble was missing. The surgeons did the best they could, like architects seeking to construct an arch without a keystone. It was inevitable that with so indispensable a part missing, the patched-up result would not be an elbow. In a spine-chilling denouement to the story of the operation, it was revealed the next day that the missing bone was found in the automobile where the plaintiff had been sitting at the moment of the impact.

In describing the operation Dr. Impink said: "We put the bone fragments together and fixed them with some wires, . . . Kirsten wires, with the idea of reforming this joint, but then found that one piece was absent to make a keystone of this joint. We had to discard that idea, take out the wires and discard the fragments which could not be fixed anywhere, and would have perhaps resulted in a rigid elbow, because it would all fuse as one solid structure and there would be no motion in any direction."

He testified further: "But the problem is that the arm must work on an axis and have a good hinge, and the point of attachment of the forearm to the arm itself was missing. Because of this necessity for rounding off the end of the humerus, therefore, we were left

with a chance of leaving a hand and forearm that was flail, and would be flail. Q. What is flail? A. It is there but doesn't work. It has no stability. Q. Work in that way? A. Well, there is no stiffness to it, no rigidity. It is like having ropes on a pulley that are too soft through the pulley. It doesn't allow you any fixation for the muscles of the forearm and the wrist to work."

Not only was the elbow itself shattered. Connecting bones, muscles and ligaments were damaged. The lower portion of the humerus was fragmented. Dr. Davis Brooks testified that Fleischman cannot use his arm to pull, grasp, throw, swing, turn, or catch. The fulcrum is gone. For all practical purposes the uselessness of the arm is equivalent to an amputation. Without self-control, rigidity, hinging, or swivelling, the arm is more like a dangling appendage than it is an autonomous limb, master of self and circumstance.

Fleischman is a commercial artist. He described his work as being, prior to the accident, that of: "designing creative displays, sign work, newspaper cuts, backgrounds, decorating stages, anything in the theatrical line or in the general run of sign work." He painted signs, designed posters, and built framework for signs. This work he can no longer perform. In the painting of signs, climbing of ladders, lettering of doors and windows, preparing of designs, and so on, the left arm is needed for grasp, balance, steadying, and direction. Destroying the usefulness of a painter's arm is like paralyzing the fingers of a violinist's hand —either hand—for one hand compresses the strings in setting the music while the other sweeps the harmony into creation.

The plaintiff suffered considerable pain during the time he was in the hospital and, for a year, he had to lie on his back with his left arm resting on a pillow.

He will continue to suffer much inconvenience and discomfort. At 41 years of age he should be at the peak of his muscular strength and artistic creative power. Normally he would remain on that plateau for a long time. His injury has toppled him from that elevation. His earning power has been greatly impaired. According to the mortality tables, which were introduced in evidence, he has a life expectancy of 28 years. While it is difficult to compute just what he would earn in those 28 years had he not lost the use of his left arm, it is reasonably certain that with the full employment of that now useless member he could have earned more than $20,000 in excess of what he may now earn. In addition to the irreparable damage done to the plaintiff's capacity to earn a living, he has suffered, in the telling words of the learned Court below, "a serious deformity and disfigurement which, for the rest of his life, will be his unfortunate lot."

All in all, we are of the belief that $20,000 is, in the light of the record, a fair and just verdict.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

I respectfully dissent from that portion of the majority opinion which considers the propriety of appellee's answer at trial to the effect that a certain statement was taken by an "insurance man" at the hospital.[1] The majority opinion overlooks the fact that this answer was not made innocently or inadvertently,

---

[1] Appellee admitted signature on statement was his, admitted certain portions of statement and denied certain other portions. Statement was not introduced in evidence nor was statement taker called as witness.

but was a "deliberate attempt"[2] on the part of the appellee to inject insurance into the trial of this negligence case.

The general rule on this subject,—long recognized in Pennsylvania and salutary in its effect,—is that in a negligence action the fact that a defendant is insured is irrelevant and the injection of such an issue is prejudicial to the extent that it calls for the withdrawal of a juror and the continuance of the case: *Hollis v. U. S. Glass Co.*, 220 Pa. 49, 69 A. 55; *Lenahan v. Pittston Coal Co.*, 221 Pa. 626, 70 A. 884; *Curran v. Lorch*, 243 Pa. 247, 90 A. 62; *Conover v. Bloom*, 269 Pa. 548, 112 A. 752; *Kaplan v. Loev*, 327 Pa. 465, 194 A. 653; *Dively v. Penn-Pittsburgh Corporation*, 332 Pa. 65, 2 A. 2d 831; *Harriett v. Ballas*, 383 Pa. 124, 117 A. 2d 693.

On various occasions this general rule has been subjected to certain exceptions and modifications which are not presently relevant.[3] However, *this rule has never been modified where there has been a deliberate attempt to inject the insurance issue into the trial.* Such an attempt was disapproved in *Kaplan v. Loev*, 327 Pa., supra, when this court refused to countenance a cross-examination where it was "obvious that it [cross-

---

[2] So characterized by the trial judge when the answer was given.

[3] *Amey v. Erb*, 296 Pa. 561, 146 A. 141; *Ellsworth v. Lauth*, 311 Pa. 286, 166 A. 855; *Cain v. Kohlman*, 344 Pa. 63, 22 A. 2d 667; *Capozi v. Hearst Pub. Co.*, 371 Pa. 503, 92 A. 2d 177; *Strout v. American Stores Co.*, 385 Pa. 230, 122 A. 2d 797; *Hendrickson v. Quaker City Cab Co.*, 84 Pa. Superior Ct. 218; *King v. Keller*, 90 Pa. Superior Ct. 596; *Portner v. Wible Bros.*, 91 Pa. Superior Ct. 522; *McCaulif v. Griffith*, 110 Pa. Superior Ct. 522, 168 A. 536; *Baymond v. Sternberger*, 116 Pa. Superior Ct. 451, 176 A. 787; *Jury v. N. Y. Central R. Co.*, 167 Pa. Superior Ct. 244, 74 A. 2d 531; *Richardson v. Wilkes-Barre Transit Corporation*, 172 Pa. Superior Ct. 636, 95 A. 2d 365.

examination] was to be carried on to inject something into the case which our decisions bar". The majority opinion in this respect nullifies *Kaplan v. Loev,* honors the general rule only in the breach thereof and places the stamp of approval of this court on a "deliberate attempt" to violate a rule long adhered to and followed in this court.

I would reverse the lower court's ruling in this respect and grant a new trial.

Mr. Justice BELL joins in this dissent.