## Francis, Appellant, *v.* Henry.

Argued March 18, 1960. Before JONES, C. J., MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

Samuel J. Feigus, for appellant.

Herman M. Buck, with him Joseph W. Ray, Jr., and Ray, Buck & John, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 4, 1960:

For many years Route 119, between Connellsville and Uniontown, consisted of a two-lane highway, divided down the middle to separate the northbound from the southbound traffic, but in 1956 the Department of Highways constructed between these two cities a parallel road to be used exclusively for the northbound traffic, while the old highway was to be confined to southbound traffic.

On September 15, 1956, Connellsville was to have a civic celebration of some kind and, in order to accommodate the expected increased traffic due to the celebration, the Highways Department decided to open the new thoroughfare on the preceding day. Accordingly, on September 14, 1956, road crews, under the direction of the district traffic engineer of the department, removed the barricades which had sealed the new road from motorists during its construction. At the same time they put up, at the southern terminus of the highway, signs and arrows directing northbound motorists to the newly built road and they posted, at the various entrances to the old road, signs warning

motorists not to enter. The same procedure, (with opposing directions, of course), was followed at the northern terminus of the highway.

The enjoyment of the improved and increased highway facilities was considerably marred on the very first day of their use by a fatal accident. A Mrs. O. Katherine Henry, traveling northwardly to Connellsville in a Ford station wagon, ignored the newly built road and took up the old road (now reserved for southbound traffic only). At a point about one-half mile before Connellsville, her car collided with a Mercury automobile being driven southwardly on that same road by John E. Francis. The violence of impact was such that both were killed outrightly. The administrator of the estate of John E. Francis brought a wrongful and death survival action against the administrator of the estate of Mrs. Henry.*

At the ensuing trial the court nonsuited the plaintiff, and this appeal followed.

We do not believe that the nonsuit was in order. In the case of *Ehrlich v. U. S. Fid. & Guar. Co.*, 356 Pa. 417 (1947), we quoted with approval what was said in *Virgilio v. Walker and Brehm*, 254 Pa. 241, 244-245, namely: "A nonsuit can be entered . . . when it is inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light most advantageous to the plaintiff, could determine in his favor the controlling issues involved."

Thus, the entering of a nonsuit is one of the most drastic procedures accomplished in a courthouse and should not be invoked unless the plaintiff's case is so

---

* The administrator of the estate of Mrs. Henry, in turn, brought a similar action against the estate of John Francis, but that case is not before us for review.

obviously opposed to relevant principles of law, reason, natural law and the immutable sequence of cause and effect that it would be folly to consume time deliberating on it. Only a case destitute of the slightest merit in law can be brought to such an abrupt end. Of course, there are such cases, and the broom of nonsuit is well used to sweep them out of the courtroom needed for the many cases having ostensible merit, but the record does not disclose that this case was one for the broom.

The trial court, affirmed by a court en banc, came to the conclusion that the plaintiff failed to prove that the actions of Mrs. Henry constituted negligence. It concluded also that John Francis was guilty of contributory negligence as a matter of law.

Although the trial judge sat without a jury, his decision is required to be based on legal reasoning and not on factual determination because a nonsuit does not encompass the contrasting weighing of the evidence presented by the opposing parties. In view of this incontestable premise, it is difficult to comprehend how and why the court entered a nonsuit, since the evidence presented on the plaintiff's side does not speak in a soft voice of negligence on the part of the defendant's decedent.

There can be little doubt that the new road between Uniontown and Connellsville was officially in use on September 15, 1956, the date of the accident, even though the Department of Highways did not formally take it over from the contractor for maintenance until November 15, 1956. Although the court below mildly questions that the motoring public was committed to using the new highway for northbound traffic on September 15th, it is highly significant that on that day the only two eyewitnesses to the Francis-Henry accident were actually on the new highway proceeding northwardly to Connellsville. Nor can it be ignored

that officials and employees of the Department of Highways testified that the new road was open to the public on September 15th, and that signs, adequately informing the public with regard to the use of the two roads, were conspicuously posted. Formal records of the Department further documented the fact that on September 14th signs were erected and barriers removed so that all southbound traffic would move on the old road and all northbound traffic would take the new road.

If, therefore, the old roadway was, on September 15th, committed to southbound traffic exclusively, it is obvious that Mrs. Henry, motoring northwardly to Connellsville on that road, was traveling on a road where she had no right to be. In a word, she was traveling in a direction opposite to the direction allowed by law. This strange event should have been enough to give the trial court pause as to whether her conduct did not, in itself, prima faciedly constitute negligence. That conduct, however, did not seem to impress the court at all. In its opinion, it said: "There was no proof of negligence on the part of Mrs. Henry except that she was going north in the southbound lane."

It would be rather difficult to find in the lawbooks a clearer first view case of negligence than the situation of one traveling north on a road where he should be traveling south. In the case of *Hankey Baking Co. v. Nat. Bread Co.*, 136 Pa. Superior Ct. 23, the plaintiff's driver was struck by the defendant's truck on the plaintiff's side of the road. In affirming the judgment for the plaintiff entered in the trial court, the Superior Court said: "This was not an intersection case, and no question as to right of way was involved. Each driver was required to keep on his own side of the road . . . If defendant's driver had stayed on his own side of the road he would not have run into plain-

tiff's truck. The case is too clear to require further discussion."

In *Miles v. Myers,* 353 Pa. 316, we cited the *Hankey Baking* case with approval. In the *Miles* case the plaintiff charged that her injuries were due to the fact that the defendant's car was being operated on the wrong side of the highway. The trial court granted binding instructions for the defendant on the premise that the plaintiff had failed to make out a case of negligence. This Court reversed, Chief Justice MAXEY saying: "It has been held that the fact that an automobile is on the wrong side of the highway makes out a prima facie case of negligence. See Amey v. Erb, 296 Pa. 561, 146 A. 141, and Hankey Baking Co. v. Nat. Bread Co., 136 Pa. Sup. 23, 7 A. 2d 6."

The case before us is much stronger for the plaintiff than the cases just cited because here it was not a question of the defendant's decedent being on the wrong side of the road, but that of being on the wrong road completely! In such a situation a trial court could contemplate entering a nonsuit only in the event the plaintiff's evidence revealed that Mrs. Henry got on the wrong road without negligence on her part. But even in such a situation, a nonsuit would not be proper if, in addition to the exculpating evidence just indicated, there was still other evidence that Mrs. Henry was negligent. It would be left to a jury, or other fact-finding tribunal, in such a state of affairs, to determine if the plaintiff had proved his case.

The lower court said: "It is axiomatic that negligence on the part of a defendant must be proved in order to fasten liability upon him." But it is equally axiomatic that negligence does not have to be proved in any particular way. It may be established by eyewitnesses, circumstantial evidence, photographs, measurements and a combination of a hundred varying methods of proof, but there can be no question that one

of the most effective ways of demonstrating negligence is to show that the alleged fault-finder was traveling in the wrong direction on a road legally closed to him. Such proof, of course, would not be conclusive, but it at least would call upon the defendant to explain what he or she was doing in the interdicted territory.

The court said further: "In the case at bar there was no proof of Mrs. Henry's knowledge that she was knowingly going the wrong way, testing an obvious danger, or assuming any extraordinary risks."

The plaintiff could not be expected to prove what was impossible of proof. How could the plaintiff or any witness know what was in Mrs. Henry's mind? Whatever knowledge she had about road conditions was something locked within the impenetrable vaults of her own consciousness and that knowledge died with her at the time of the accident. But the court endeavored to argue her case posthumously by asserting that "Mrs. Henry could well have been legitimately confused."

No court has such omniscience that it can, within the law, enter a nonsuit on the supposed thinking of a deceased person. Moreover, if, in verity, Mrs. Henry was confused, a question of fact would arise as to whether that confusion was due to carelessness on her part; and carelessness, in legal language, is negligence.

The cardinal fault in the lower court's reasoning lies in the phenomenon that it argues the case as if it were a jury. Thus it says that: "Defendant produced some testimony that barricades preventing use of the new road by traffic making a left turn north off Oglevee Lane were not removed until the Monday after the accident"; that a Marie Bandnarik, a defendant witness, "testified that her companion, driving from the direction of Uniontown, had stopped on the 15th, before using the new piece of road, for the very purpose of determining whether the new road was open, and that there were then no signs to guide them,

but they saw other cars using the new road and decided that it must be open"; and that: "Defendant offered witnesses to show that some cars were still using the old road for northbound movement even after the accident here involved." But this is all evidence which a jury would consider in determining whether the defendant had explained away the admitted incongruity of being on the wrong road. However, we must repeat that the court below entered a nonsuit—and a jury has no authority to declare a nonsuit. A nonsuit is strictly a legal proceeding and is within the province of the court exclusively.

Moreover, the fact that a few cars used the old road for northbound traffic after the accident occurred could in no way prejudice the claim of the plaintiff as to what the defendant's decedent did on September 15, 1956.

The court also found the plaintiff's decedent guilty of contributory negligence and said: "From the photographs, and the testimony of Trooper Bingaman, it seems clear that plaintiff's decedent could have averted the accident by turning into the right hand lane if he had been alert and maintaining a proper lookout."

Here again the court is arguing facts and here again it ignores the fundamental rule that in considering a nonsuit, all inferences rising from the evidence must be interpreted in favor of the plaintiff. But one does not even need to resort to this rule to show the lower court's error with regard to the testimony of Trooper Bingaman. This police officer arrived at the scene of the accident an hour after the collision and after the vehicles and the bodies had been removed. He testified in the nature of an expert, which, of course, he was quite well qualified to be, having had 14 years' experience on the Pennsylvania State Police.

The actual point of impact between the two cars occurred on a curve and at an elevation in the road,

these two factors impeding the possibility of either of the drivers seeing the other at any considerable distance before the collision. After examining the skid marks in the road, studying the terrain and topography involved, Trooper Bingaman testified as follows: "Q. Now where did the point of impact, as you observed from these skid marks, occur with relation to the curve and the hill that exists at that section of the road? A. Well the road has a slight curve to the left going that way. Wait until I get that, a slight curve to the right traveling south, and the skid marks were just over a slight knoll, and the point of impact was some distance over this knoll on the left hand side of the highway. Q. Now, are you now thoroughly familiar with that vicinity? A. Yes, sir, I have traveled it many times. Q. Now with relation to this knoll that you talked about as being near the approximate point of impact, are there grades going down both ways, that is toward Connellsville and toward Uniontown in connection with that knoll? A. Yes, there are. Q. And in your opinion and from your experience after having traveled that road as often as you say you have, would these parties have had the ability to see each other within any length of time? A. I would say not more than 100 feet."

In this state of affairs, assuming that the drivers were traveling at a normal rate of speed for open country (not exceeding 50 miles per hour) Francis would not have had a chance within the rapidly closing gap of 100 feet (or slightly more) to turn into another lane before the cars were on top of one another, especially when one considers the instant's mentally paralyzing shock which Francis must have experienced when he saw for the first time a car only one hundred feet away and aiming directly for him head-on. Discussing a somewhat similar situation in the case of *Fleishman v. Reading,* 388 Pa. 183, 186, we said: "When

a driver approaches the crest of a hill, there comes a moment when, because of the convexity of the highway, he has practically no guaranteed clear distance ahead, but he can reasonably be assured that no one will be insane enough to approach the crest of the road from the other side of the summit, using the contrary lane of travel. If such a predicament should develop and a collision result, the motorist on his own side of the thoroughfare cannot be declared guilty of contributory negligence as a matter of law on the theory that he did not have an assured clear distance ahead."

It would be a question of fact and not of law as to whether Francis, in the sudden emergency, which, like a flash of lightning confronted him, did what a reasonably prudent person would have done in seeking to avoid the impending catastrophe, by jamming on his brakes which he did. But even if it could be established that he erred in not turning into the next lane, which, under the circumstances, could only be a highly speculative error, he still could not be charged with contributory negligence as a matter of law because whatever action he took was the result of a desperate resolve to extricate himself instantaneously from a mortal danger which he had done nothing to create. (*Zurcher v. Pittsburgh Rwys. Co.*, 353 Pa. 212, 216.)

In the case of *Christ v. Hill Metal and Roofing Co.*, 314 Pa. 375, 380, the trial court entered judgment n.o.v. on the basis that the plaintiff, who was driving a motorcycle, was guilty of contributory negligence because, although the defendant's vehicle had approached from the wrong direction, the plaintiff should have brought his motorcycle to a stop in time to avoid a collision. We reversed, Justice MAXEY saying: "On a one-way city street, as here, plaintiff cannot be held negligent as a matter of law because he approached the intersection at a speed so great that he could not stop his motorcycle in time to avoid a collision with

a car approaching the same intersection from the right, *from which direction plaintiff had no reason to expect a car would approach,* such an approach being interdicted by the regulations of the municipality controlling that street. It is true that it was his duty to attempt to stop his motorcycle as soon as he saw the car actually approaching from the right, but, as already noted, his case does not disclose a failure on his part to make such an attempt." (Emphasis supplied.)

Equally, in the case at bar, the skid marks in the road show conclusively that Mr. Francis attempted to stop his car before the crash. The court says in its opinion: "Skid marks of the Francis car extended for 35 feet from the point of impact, while those of the Henry car were visible for a distance of 66 feet. According to the testimony of Trooper Bingaman of the State Police, there was no indication that either car was exceeding the speed limit of 50 miles per hour. He also testified that at that speed there would be a reaction time of 55 feet, and 111 feet brake traction to make a complete stop. He believed that the two drivers could have seen each other for only 100 feet; but this estimate is unduly low, as the skid marks themselves show a mutual visibility of 101 feet, and with reaction time added the distance would be 211 feet (Tr. 157-58, 165-67). The eyewitness Gilmore testified that they saw each other when 200 feet apart."

Assuming, therefore, that the cars were 200 feet apart when the drivers saw each other for the first time, and assuming that they were traveling at the rate of 50 miles per hour, and allowing time for inevitable reaction, (which includes perception, intellection, emotion, and volition), this would mean that the two vehicles speeding toward each other would crash before a whole second had ticked off on the fateful clock of inevitability. The application of the law to variable facts is not so exact a science that a judge may ap-

ply it with such calipered precision as to say, as he ponders the matter in the serenity of his chambers, that a motorist in the fright-crazed moment of a frantic decision to be made in a second's time, is required to use infallibly Solomonic judgment, failing which, he will be declared guilty of contributory negligence.

The order of the court below is reversed with a venire facias de novo.

Mr. Justice COHEN and Mr. Justice BOK concur in the result.