O'Donnell, Appellant, *v.* Bachelor.

Argued January 9, 1968. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Henry T. Reath,* with him *Duane, Morris & Heck-scher,* for appellant.

*E. William Heuser,* with him *Jonathan H. De-Young,* and *Torak and DeYoung,* for appellee.

Opinion by Mr. Justice Musmanno, April 16, 1968:

On the night of January 9, 1965, Eugene F. O'Donnell, and his wife, in an understandable desire to satisfy a yearning for pizza, drove from their home in Merion to Lower Merion Township, to obtain a pizza at Mama's Pizzeria located on Belmont Avenue. He parked his car in an empty lot on the south side of the highway and crossed over the road to make his purchase. Then, with his treasure under his arm, he started back to his automobile, where his wife awaited him. When he was about one-third of the way across, he noted an automobile traveling in an eastwardly direction on the other side of the roadway. He stopped to let the car pass. He was to testify later: "I stood there waiting for him to go by, waiting to cross the street, but instead he came over and hit me. It was as simple as that."

The violence of the impact was such that O'Donnell was catapulted into the air and landed in the parking lot, sustaining, through the collision and the landing, grave injuries, the nature and extent of which it is not necessary to specify here. The driver of the colliding car was William Alfred Bachelor, against whom O'Donnell brought a suit in trespass. At the ensuing trial, the jury returned a verdict in favor of the defendant, and the plaintiff has appealed, requesting a new trial, urging trial errors.

The defendant testified that when he first saw O'Donnell on the street, he was 194 feet away from him, and that he was traveling at 15 miles per hour, so that, under normal conditions he could have easily stopped his car to avoid striking the pedestrian. However, he testified that the plaintiff walked in front of his lane of travel.

Thus, the issue of fact left to the jury to decide was whether the defendant left his assigned portion of the

highway and crossed over to where the plaintiff had the right to be and struck him there, or whether the plaintiff placed himself in the line of collision. To bolster the defendant's version of how the accident occurred, defendant's counsel called to the witness stand a William Rock who had visited the plaintiff while he was in the hospital and had talked to him. In relating what occurred in his conversation with the plaintiff, Rock testified: "He noticed that Mr. Bachelor was coming fast. For a minute he was undecided as to whether to run across or to turn around and go back from whence he came. He decided he had to run across, so he ran but he did not make it. The right front fender near the headlight of the car struck him and that is the last he remembered."

It cannot be doubted that Rock's testimony inflicted a crippling blow to the plaintiff's case because, if believed, it convicted O'Donnell of contributory negligence. Indeed, after about three hours of deliberation after the case had been submitted to them, the jury sent a note to the judge: "We are deadlocked on contributory negligence. We have been debating this one question all afternoon and cannot reach agreement."

The judge advised the jury by a written note: "Please continue in an effort to reach agreement. At 6 p.m. we will recess until 8:30 p.m."

At 8:45, the jury returned its verdict for the defendant.

Since Rock's testimony could well have been the catalysis which precipitated the verdict, it is in order to inquire who was Rock and what was he doing in an injured man's room in the hospital where, suffering from a smashed hip and holes in his knees, he was trussed up in a skeletal traction, agonizing under muscle spasms of such severity that at times he became delirious. Rock admitted that he talked to the plaintiff

while the latter was under sedation to allay his other-wise unbearable pain. Was Rock an impartial witness?

Under direct examination Rock was merely identified as a private investigator engaged by Malcolm Waldron, an attorney. In an attempt to learn what bias or prejudice Rock might have entertained in the legal controversy, plaintiff's counsel questioned Rock as follows: "Q. Mr. Rock you told us that you were engaged to investigate this accident, is that correct? A. Yes, sir. Q. You were engaged by Mr. Malcolm Waldron? A. Yes, sir. Q. Who is Mr. Waldron? A. He is an attorney. Q. For whom?"

At this point the trial judge intervened: "He is an attorney. That is sufficient."

It was *not* sufficient, and the judge's intervention at this point was a non sequitur. The plaintiff had the right to know who was Malcolm Waldron, what connection he had with the case, and whom if anybody he represented. Once a witness commits himself to the ocean of a legal controversy, he must, under cross-examination, disclose the flag under which he sails. Rock refused to do this and the trial judge unwittingly gave support to Rock's defiance of the rules of evidence, and cardinal principles of justice. The judge, in defending his ruling, explained that Waldron was "an attorney associated with defendant's counsel." There is nothing in the record to establish such an association.

There is indication that Rock was not an impartial witness nor an impartial investigator and that he was employed by the insurance company which carried the defendant's insurance against personal liability. On February 24, 1965, Rock, in making a report to a Mel Allen, connected with the insurance carrier, said: "This is a status report on the above-captioned file. I have been keeping in touch with the claimant, Eugene

O.'Donnell, who is in Room 632 in Lankenau Hospital. Situations have been such that I have been unable to secure a recorded statement from him because of the presence of other people in the room when I have visited him. I have gained his confidence and I hope I will be able to secure a recorded statement from him which would be favorable toward the insured driver and enable you to defend this case.''

Rock had actually arrived at the hospital with a tape recorder seeking to have O'Donnell talk into it even though O'Donnell's condition dictated against any such rude interference with the intensive care being exercised by doctors and nurses in behalf of their gravely injured patient. Rock also failed in trying to get O'Donnell to attach his signature to a statement.

But, not succeeding in his plans to obtain what could be accepted as a reliable expression of O'Donnell's account as to how the accident occurred, Rock was left to his own devices to say what O'Donnell had said only 10 days after the mangling accident, while harnessed to his bed, saturated with narcotics and sedatives and undergoing mental torture as to when, if ever, he would ever walk again.

Apart from the duty devolving upon the trial judge to allow full disclosure of Rock's identity and the name of his employer, an obligation rested upon him to instruct the jury on the conditions under which Rock was supposed to have talked with O'Donnell. Relations between man and man presuppose a fundamental fairness in each other's honesty that is as elementarily a part of our jurisprudence as the Twelve Tables were part of the Roman Law.

Thus, the judge should have charged the jury on the unusual circumstances surrounding the obtaining of the alleged oral statement from the hospital patient and he should also have instructed the jury as to the

caution to be exercised in accepting a unilateral statement of the character here indicated. It may be noted in passing that Paul Castellucci, the owner of the Mama's Pizzeria, testified that Rock, in talking to him, gave him the impression he was representing O'Donnell. Whether such deception occurred was a matter of moment in determining what credibility should be assigned to Rock, but the judge, in his charge, in no way indicated to the jury how they should scrutinize Rock's words and his conduct, in determining whether his oral statement, as to what O'Donnell is supposed to have said, was based on fact.

Indeed, the judge, unintentionally of course, may have misled the jury when he told them that Rock "was employed by one of the attorneys." "One of the attorneys" obviously implies an attorney in the case. Waldron did not represent the plaintiff or the defendant. The judge also misdirected the jury when he said to them that Rock was "a paid investigator on behalf of the defendant." No one made any such statement during the trial.

In criminal law the courts have thrown every possible protection around the accused to save him from self-incrimination. The accused may not be questioned unless he is first informed that what he says may be used against him, he can demand the presence of an attorney and if he has none, one will be provided, etc., etc. Yet, in this case, the plaintiff, while not charged with crime, conviction of which could have deprived him of his liberty, was facing a future which could deprive him of freedom of movement, accompanied with severe pain and inability to earn a living. If O'Donnell did not recover in court moneys which would reimburse him for the enormous outlays he had to expend for hospitals and doctors, and the sums needed for the future surgery prescribed, he might well be, from then on, incarcerated in penury and want.

While O'Donnell languished in such a state of mental and physical torment, Rock entered into the privacy of his room and, through unlaudable methods hinted at in his report to Allen, carried on stealthily to obtain a statement, not of the unvarnished truth, but a statement which would be "favorable" to his employer, the insurance company. An innate sense of justice, equity and fair play rebels against such a procedure, but there is nothing in the judge's charge which would suggest that what Rock had done was other than wholly proper and in accordance with law and fair play. At the very least, the judge might well have explained to the jury the possibility of error in recollection, in view of the fact that there was no written statement.

Of course, the reason the judge refused to allow cross-examination on Rock's real employer was that he feared revelation of the fact that the defendant Bachelor carried liability insurance. While, of course, we have ruled that a gratuitous reference to personal liability insurance in personal injury cases is ground for a mistrial, we have never said that the mention of insurance, per se, like dynamite with a live fuse, will blow up the case. There are many instances where the circumstances not only do not justify the curtaining off of the existence of insurance, but, indeed, require that the curtain be torn aside to reveal who is actually pulling the strings in the puppet drama of liability and nonliability.

It cannot be denied that a witness's interest in the pecuniary disposition of a lawsuit inclines him toward trimming the sails of his testimony so as to bring the verdict into the port of his fiscal enjoyment. The particular circumstances in this case dictated that the plaintiff should have been permitted to show that Rock was employed by the insurance company responsible

for any verdict against the defendant so that the jury could determine whether this employment-relationship predisposed him toward favoring the defendant's side of the case in his recollection of what occurred in his unilaterally imposed visit on the plaintiff.

Certainly, if the plaintiff had employed an investigator to obtain witnesses and evidence helping his cause and *that* investigator had testified on the results of his investigation, he could have been compelled, under cross-examination, to reveal his financial attachment to the plaintiff's case. Why should it be different when the witness is paid by an insurance company, which could be even more concerned about the monetary verdict than the defendant since it will be called upon to pay any verdict rendered in favor of the plaintiff?

This Court specified quite clearly the law in this respect in the case of *Fleischman v. Reading*, 388 Pa. 183, 190-91, where we said: "An insurance company which is actively defending a lawsuit for damages has as much interest in the outcome of the trial as the plaintiff and cannot claim immunity from rules which are binding on its adversary, the plaintiff. Allowing to every insurance investigator credit for honesty, integrity, and square dealing, he is still a partisan defending the interests of his employer to the best of his ability. Whether, in his zeal to properly represent his employer, or, whether through human error, he gives the plaintiff the worst of it in any report he makes to the insurance company, which report is later read in court, it is up to the jury to determine, between the investigator and the plaintiff, who is entitled to the greater credibility. However, before the jury can make this decision, the mask of anonymity must be lifted, and the investigator given a local habitation and a name."

The defendant argues that the *Fleischman* case can be distinguished from this case. If anything, the *Fleischman* case is broader in the mention of insurance than the facts in this case indicate. There the plaintiff had actually signed the statement which was produced in court. The plaintiff was asked if he knew who it was that took his statement and the following colloquy occurred: "Q. Did you know later who he was? A. Yes, he left his card on the dresser, and a visitor a day or two later told me a certain man was in to see me because he must have left a card, and I didn't know anything about it. Q. Who was the man that took it? A. An insurance man."

The defendant moved for the withdrawal of a juror on the ground that the mention of insurance had prejudiced the interests of his client. We held that the jury was entitled to know who had taken the statement which was read in court. We asked: "Was he a detective? A policeman? A statistician? A traffic consultant? Was he a phantom?" We affirmed the verdict rendered for the plaintiff in that case.

How much more was it necessary to know the identity and antecedents of the investigator in this case when he did not present any written statement, but merely gave his recollection of what had occurred? In the case at bar the trial judge refused to allow any questioning as to Rock's personal interest in the legal controversy and ordered the ceasing of questions on the mere utterance that Rock had been employed by an attorney. What attorney? Whom did the attorney represent? By this closing of the door of cross-examination Rock was allowed to stand before the jury in the light of an impartiality which does not dazzle with its brightness up here. The error of the court in so truncating cross-examination requires the ordering of a new trial.

The other reasons advanced by the plaintiff for a new trial are not discussed because, in our view, after study, they do not of themselves represent errors justifying a new trial.

Reversed with a venire facias de novo.

Mr. Justice JONES, Mr. Justice EAGEN and Mr. Justice O'BRIEN concur in the result.

---

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in the result on the authority of *Argo v. Goodstein*, 424 Pa. 612, 228 A. 2d 195 (1967); *Yarsunas v. Boros*, 423 Pa. 364, 223 A. 2d 696 (1966); *Kersey Manufacturing Co. v. Rozic*, 422 Pa. 564, 222 A. 2d. 713 (1966), and *Gould v. Argiro*, 422 Pa. 433, 220 A. 2d 654 (1966).

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I believe this case involved an intentional attempt by plaintiff to bring to the attention of the jury the fact that defendant was insured. Not only was this improper, as well as grounds for the withdrawal of a juror, but it was unnecessary, since the interest and possible bias of the witness Rock clearly appeared because he admitted he was employed by the defendant's attorney, and this fact was emphasized by the Judge in his charge to the jury. It is clear, therefore, that the question of Rock's credibility and his adverse interest was adequately covered. Moreover, (a) no exception was taken by appellant to the Judge's charge to the jury, and (b) there was no reversible error.*

For these reasons I dissent, and would affirm the judgment of the lower Court, which sustained the jury's verdict and was supported by strong evidence.

---

* I further disagree with several statements in the majority Opinion, which statements contain (in my judgment) mistakes of law.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

Even "an understandable desire to satisfy a yearning for pizza" should not be enough to sustain the grant of a new trial where the record conclusively demonstrates that none is necessary. In my view such a demonstration so vividly exists that I would have no difficulty whatsoever affirming the court below.

I agree with the majority that the testimony of Rock was perhaps the single most significant factor contributing to the jury's verdict. However, this does not mean that his affiliation with appellee's insurance company should have been made known to the jury when that same jury had been told *throughout* the trial, not only by appellant's counsel, but also by Rock and the trial judge himself, that this investigator interviewed appellant, reported his findings, and testified in court *all* on behalf of defendant-appellee. To me this is more than sufficient to demonstrate to the trier of fact "the flag under which he [Rock] sails." But the majority would have this Court go even further and reveal not only the flag but the seamstress who sewed it. To me, this is an unwarranted departure from the well established rule that the jury should not be told of a defendant's insurance coverage. Indeed, having told the jury that Rock was an investigator for the defendant, this was enough to alert everyone in the courtroom as to this witness' possible prejudice and bias. The trial judge therefore did exactly the right thing by refusing to reveal that defendant's *insurance* company directly employed Mr. Rock.

*Fleischman v. Reading,* 388 Pa. 183, 130 A. 2d 429 (1957), relied upon so heavily by the majority, is easily distinguishable. In *Fleischman,* as in the present case, an investigator employed by defendant's insurance carrier went to plaintiff's hospital room and there secured some very damaging statements from the mouth of the

injured man. Here, however, is where the similarity between the two cases comes to an end. In *Fleischman,* the plaintiff's statements made in the hospital were immediately reduced to writing and signed by plaintiff. At trial, this document was used extensively by defense counsel to cross-examine plaintiff. However, not once during this cross-examination did defense counsel ever indicate that the investigator who secured the statement was even connected with the litigation, let alone employed by someone in defendant's camp. Therefore, on redirect examination plaintiff's counsel asked his client who the investigator was, whereupon plaintiff replied, "An insurance man." Defendant's motion for the withdrawal of a juror was denied, and this denial affirmed by our Court on the theory that without the mention of insurance, the jury would have had *no way of knowing* on whose side the investigator was. As the Court there said of this investigator, labelled by Mr. Justice MUSMANNO as "Mr. Shadow": "So far as the jury was concerned, Mr. Shadow could even have been someone speaking for the law, someone representing the Court, someone authorized to conduct an impartial interrogation." 388 Pa. at 190, 130 A. 2d at 433. In the present case, however, far from being a shadow, our investigator is solid as a "Rock."

On cross-examination, Rock was asked about a certain interview he had with the owner of Mama's Pizzeria. The following appears of record concerning that interview: "Q. [by Mr. Reath, for appellant] What did you tell him [the pizza shop owner] as to whom you represented? A. I told him that I was representing the defendant in this case." (Record at 119a.) At this point there can be no doubt that every juror *must* have recognized Mr. Rock's flag. But, just to make sure that the markings on this flag were not

misinterpreted, appellant's counsel read to the jury the letter, whose text is set out in the majority opinion, in which Mr. Rock told his employer that he hoped to be able "to secure a recorded statement from him [appellant] which would be favorable toward the insured driver . . . ." It is indeed curious that the majority opinion clearly recites the contents of this letter in order to show the bias of Mr. Rock, yet fails to mention that the letter was also read to the jury for precisely the same purpose! (Record at 126a.)

Moreover, twice during his charge to the jury the trial judge called attention to the fact that Mr. Rock worked for the defendant (Record at 139a and 169a), the second time even saying: "I have already told you that . . . [Rock] was a paid investigator on behalf of the defendant and his testimony . . . must be considered in light of his credibility. In determining . . . [Rock's] credibility, you may, of course, consider whatever interest he has in the outcome of the case." In spite of this charge, the majority would have us believe that reversible error was committed by the lower court's failure to instruct the jury as to Rock's possible bias. Not only *did* the judge so charge, but furthermore he did so completely sua sponte. At no time did counsel for appellant request such an instruction; at the conclusion of the charge, when asked by the court, appellant's counsel said of the charge actually given: "I have no further comments. Thank you, sir." (Record at 175a) Appellant's new trial motion was devoid of any indication that the charge on Rock's interest in the case was in any way erroneous. And finally, even before this Court, both in his brief and on oral argument, counsel for appellant has voiced not a single word in objection to the *charge* vis-a-vis Mr. Rock's testimony, his argument going solely to Rock's cross-examination. Thus, the majority has taken what

it believes to be an error in the jury charge and used it as a basis for relief when it was *never* argued below, *never* pressed on appeal, and *never* even made.

There is finally one more significant issue raised by this appeal, an issue that the majority does not even see fit to recognize. During its deliberations, the jury sent a note to the trial judge indicating that it was deadlocked on the issue of contributory negligence. The judge replied in writing that deliberations should continue until dinner time. Although the majority sets out the *text* of this jury note, it nowhere indicates that counsel for appellant was *never* informed that the note was sent. I realize that the majority opinion writer, as well as Mr. Chief Justice BELL and myself, do not believe that the failure to inform counsel of such a jury question is reversible error per se, nevertheless, a majority of this Court *has* adopted a prophylactic rule requiring a new trial whenever such an incident occurs. See, e.g., *Argo v. Goodstein,* 424 Pa. 612, 228 A. 2d 195 (1967).

Thus, although I continue to adhere to my previous position that a new trial need only be granted upon a showing that the failure to notify counsel prejudiced one of the parties, and although I do not believe that any such prejudice was here shown, one would, following the prior decisions of this Court, be forced to conclude that a new trial was properly awarded in this case were it not for the fact that this argument has been waived.

Admittedly, appellant failed to raise the issue of the jury's note in his motion for new trial. However, in his brief before this Court, counsel for appellant has attached an affidavit in which he explains why the issue was not timely raised. According to counsel, he did not discover that the note was sent until he read the notes of testimony which contained the jury's mes-

sage. He then avers that these notes of testimony were not available when the new trial motion was filed with the court below. Although I am sure that all the allegations contained in counsel's affidavit are true, they nevertheless fail to explain satisfactorily the failure to raise this issue below.

It is true that the new trial motion was filed before the notes of testimony had been made available. But, new trial motions are *usually* filed in just this manner. The motion in the present case contained the typical clause in which counsel reserved the right to file additional reasons to support the motion when the trial record was prepared. However, even though the motion was not disposed of until October 7, 1966, almost ten months after it had been filed, and even though counsel must have had more than enough time to scan the trial record during that time, still the issue of the jury's note was not raised below as an additional reason for granting a new trial. I must therefore conclude that this issue has been waived.

Absent the jury's note as a reason for reversal, I am totally unconvinced by the majority's opinion, and therefore dissent.